# CHARLESTON.

CLEMENT L. SHAVER *v.* THE CONSOLIDATED COAL COMPANY

(No. 6503)

Submitted November 19, 1929. Decided December 17, 1929.

*John W. Davis* and *H. H. Rose,* for defendant in error.
*Tusca Morris, A. F. McCue* and *Murray, Aldrick & Webb,*
and *Hoffheimer & Templeman,* for plaintiff in error.

LITZ, JUDGE:

The plaintiff, Clement L. Shaver, obtained a verdict and judgment for $251,853.85 against the defendant, The Consolidation Coal Company (plaintiff in error), for services rendered by him to the corporation as broker in effecting the lease of coal lands, owned by it, to J. A. Paisley "for and during the term of years necessary to excavate, mine and remove all of the coal in the leased premises."

The verdict and judgment is based upon an alleged oral agreement of January 18, 1923 (the day before the lease was executed), between C. W. Watson, as president of the defendant, and Shaver, in which the former agreed to pay

the latter 5% of the value of the lease fixed at a sale price of the property of $500.00 per acre. The defendant admitted that plaintiff was to receive a commission of 5%, but contended, according to the testimony of Watson, that it was to be paid out of the rental installments, when and as received by the defendant. It also plead, and offered evidence to prove, as a bar to the action, that the plaintiff, without its knowledge, had represented Paisley for hire in the transaction.

Watson employed Shaver in the summer of 1920 to procure a purchaser for a tract of 11,720 acres undeveloped coal lands, belonging to the defendant, in Monongalia county. Having been intimately associated in a business way and otherwise for many years, they were, at that time, apparently in the complete confidence of each other. Shaver, after ascertaining that a coal mining company, controlled by Paisley, owned adjoining lands, inquired of him by letter whether he would be interested in the purchase of the 11,720 acre tract. Whereupon, Paisley wrote Watson inquiring if Shaver had authority to negotiate the sale. By letter dated September 21, 1920, Watson replied: "I have yours of the 13th instant enclosing communication from Mr. Shaver. Any sale of property made by The Consolidation Coal Company will have to be approved by the directors before it becomes binding, but I have no doubt they will carry out any deal made by Mr. Shaver." On receipt of this advice from Watson, Paisley answered Shaver, stating that he was interested in the proposition. Negotiations between Paisley and Shaver, immediately initiated, and continued by personal interviews, telephone conversations and interchange of letters, resulted in an option from the defendant, dated October 27, 1920, granting Paisley the right for sixty days to purchase the 11,720 acre tract and four other parcels of developed coal lands, owned by it, in Monongalia, Marion and Harrison counties, for a consideration of $6,436,700.00, 10% of which to be paid in cash, and the remainder in quarterly installments of $150,000 each with interest at 6%. The option was renewed for a further period of ninety days, but owing to a depression in the coal market, the right to purchase was

not exercised, and further negotiations between Paisley and Shaver were suspended awaiting favorable developments in the coal business. December 6, 1920, while the option to purchase was pending, Shaver wrote Paisley: "Your wire did not connect at New York and just this morning received, though I had sent you a letter practically covering the same subject matter. Now, before asking this, we better have a conference and go over it fully. I do not want to fail, and the lack of authority or rather the timidity of calling a meeting of the directorate of Consolidation may interfere somewhat. *I am willing to go my limit when you really need and must have it.* I think you understand that."

Paisley, being approached again on the subject by Shaver in August or September, 1922, indicated a desire to lease the property. September 15th, Shaver again wrote Paisley: "Since thinking of the matter we were discussing yesterday, it seems to me it would be well to look at the terms of the agreement we last had on this subject and adopt the rate of interest therein. You remember that we had considerable struggle then on that point and doubt it advisable to try to change it. Make your computations on a twenty-five year basis with as fair a cash payment as you feel you can stand. I suggest that you try to include the little plant on the Monongahela River Road, though I am doubtful about your getting it. Think I would make up my figures both ways, with the operations, and for the bare acreage without the operations. You may remember that we started into deal last time on acreage and four plants; the one above discussed, the one at the edge of the town on the same road containing 82 acres, the one at Lumberport 700 plus acres and a small fuel plant on the Short Line at Clarksburg. This latter plant has been disposed of, it could not be had. You might return to the original proposition and in lieu of this plant, demand the one at the edge of town of 82 acres be included. I merely make this suggestion for your benefit. What I am more anxious about than anything else is that there be no disposition on their part to jump the price and I don't believe there will be, but there is and has been some provocation about it. One party tried to get it at $600. An-

other party had just asked them $600. for coal of about equal quality and depth. The very earliest date that we can take this up in a definite way is the best date. You can communicate with me at Fairmont and I will keep your office advised of any change in my whereabouts." Further negotiations between them ensued, resulting in an option from the defendant to Paisley, dated November 2, 1922, granting him the right until March 1, 1923, to lease the 11,720 acre tract upon the following terms: $500,000.00 to be paid as advanced royalties on the execution of the lease; $269,696.59 at the end of the first year; and the balance in 156 quarterly installments of $90,000.00 each; the lessee being also required to pay all taxes on the leased premises. This, as well as the option to purchase, was executed by Watson in the form of a letter to Paisley after a conference at the time with Shaver at the office of defendant in New York. Referring to the option of November 2, 1922, Shaver wrote Paisley on the same date, stating: "This paper will give you a very good working basis for your future efforts in the matter." November 15th, he again wrote Paisley.: "In order that there may be no confusion about all this, I return the paper signed by you, as I had not forwarded it to Watson, and in lieu thereof write him a letter about as above draft and mail direct to him at once." The draft of letter prepared by Shaver for Paisley to send Watson follows: "C. W. Watson, President, Consolidation Coal Company, New York City. The option to lease the 11720 acres of Pittsburgh coal known as Penmont field in Monongalia County, W. Va., you so kindly sent me at the instance of Mr. Shaver was duly received and I thank you for same. I find I have overlooked until now acknowledging the receipt of the paper though my office had wired Mr. Shaver and I had personally consulted him by phone in reference to the matter. I want to express my regret at this seeming negligence on my part. I am greatly interested in this matter and hope by the time specified therein that I may be able to exercise this option and take the property. Will keep you advised from time to time relative to matter." Negotiations between Paisley and Shaver continued, and about January 8, 1923, after

Paisley had announced his intention to exercise the option; they met at the office of the defendant in New York, where and when Shaver introduced Paisley to Watson, and the proposed lease was further discussed. The three met again at the same place on January 18th for final agreement between Paisley and the defendant, the main questions remaining to be settled being the rate of interest to be applied in calculating the periodic royalty payments on a valuation of $500.00 per acre for the lands, and the security to be provided by the lessee for performance on his part. These two questions were adjusted by fixing the rate of interest at 5%, and permitting Paisley to relieve himself of all obligations under the lease by assigning it to a corporation which he might cause to be formed under the laws of West Virginia with a paid-in capital stock of at least $600,000.00 and which should contemporaneously with the assignment legally assume the performance of such obligations. Paisley and Watson were slow to reach an agreement on the rate of interest. The latter demanded 6% while the former insisted on 4%. They were in separate rooms while attempting to agree, with Shaver passing back and forth conferring first with one and then the other.

The deed of lease from the defendant to Paisley, dated January 19, 1923, leasing the tract of 11,720 acres of undeveloped coal lands in Monongalia county and two other parcels in Marion and Monongalia counties which were then being operated for coal, required the lessee to pay to the lessor as royalties, $87,584.69 upon the delivery of the instrument, $87,584.64 June 25, 1923, and each three months period thereafter until the sum of $14,013,550.40 shall have been paid. It further required the lessee to pay the taxes on the leased premises, and to expend in the development of the property $200,000.00 during each of the years ending March 1, 1924, March 1, 1925, March 1, 1926 and March 1, 1927. The rights of the lessee were subject to forfeiture for failure to comply with certain terms of the lease. The consideration and terms of payment were calculated upon a basis of $500.00 per acre for the lands, with interest at 5%. The lessee was permitted to relieve himself of all personal obligations by

assigning the lease to a corporation, in accordance with the said previous agreement of the parties. The lessor was required, upon payment in full by the lessee of the rents, royalties and taxes, to convey the lessee its title to the lands.

The Morgantown Gas Coal Company, a corporation, thereafter formed, at the instance of Paisley, with paid-in capital stock of approximately $600,000.00 was, by formal agreement between itself and the lessor, substituted as lessee as of the date of the original lease. The lessor consented to a postponement of time for the beginning of improvements on the property, and, by writing dated December 1, 1926, waived the royalties for 1926, 1927 and 1928. According to the books of The Morgantown Gas Coal Company, the lessee has paid as royalties and taxes, and expended in improvements on the leasehold premises, the following sums of money:

## ROYALTIES

| | | |
|---|---|---|
| Jan. 20, 1923 | $ | 87,584.69 |
| June 25 | | 87,584.69 |
| Sept. 25 | | 87,584.69 |
| Dec. 25 | | 87,584.69 |
| Mar. 25, 1924 | | 87,584.69 |
| June 25 | | 87,584.69 |
| Sept. 25 | | 87,584.69 |
| Dec. 25 | | 87,584.69 |
| Mar. 25, 1925 | | 87,584.69 |
| June 25 | | 87,584.69 |
| Sept. 25 | | 87,584.69 |
| Dec. 25 | | 18,213.66 |
| Mar. 25, 1927 | | 30,000.00 |
| June 25 | | 30,000.00 |
| Sept. 25 | | 30,000.00 |
| Dec. 25 | | 30,000.00 |
| July 31, 1928 | | 34,246.95 |
| July 25 | | 7,428.02 |
| Aug. 25 | | 7,026.72 |
| Aug. 25 | | 7,203.89 |

| | | |
|---|---|---|
| Sept. 25 | ............................................. | 5,654.46 |
| Sept. 31 | ............................................. | 7,740.91 |
| Total | ............................................. | $1,170.946.20 |

## TAXES

| | |
|---|---|
| 1923 | $38,484.19 |
| 1924 | 47,055.92 |
| 1925 | 53,551.33 |
| 1926 | 58,317.31 |
| 1927 | 56,097.00 |
| Total | $253,505.75 |

## IMPROVEMENTS

### $403,575.05

No one witnessed the agreement between Watson and Shaver fixing the amount and terms of payment of Shaver's commission, which was entered into at the office of the defendant in New York, January 18, 1923. Shaver stated his version of the contract as follows: "Senator Watson stepped out the door and I was sitting in a chair on the outside, about two or three steps away, I think the board was inside, I presume meeting, he said will 5% satisfy you? I said it will provided it is paid to me over a period of eight to ten years, provided it is all paid within a period of eight or ten years. He said let it run along for two or three years and if it is all right, we will pay it all to you if you want it." Watson, denying that the commission was to be paid absolutely, testified that Shaver was to receive 5% of the respective royalty installments as and when paid. A resolution was adopted by the board of directors of the defendant on the day of the agreement fixing the amount and terms of payment in accordance with the testimony of Watson, the contents of which, Watson said, were known to Shaver by reading the resolution himself, hearing it read by the witness or it being

discussed by both. Shaver denied knowledge of the resolution and further stated that on the 19th of January he requested of Sprigg D. Camden, a vice-president of the defendant, a copy of any resolution entered by the board of directors with reference to his commission, but was told by Camden that the resolution "was not ready or had not been prepared"; that he made a similar request of Camden some time later with like result, and was not furnished a copy of the resolution in question until May 7th. Camden does not testify. Watson testified also that a resolution was adopted by the board of directors of the defendant at the time the option was granted to Paisley to purchase the property fixing the commission of Shaver at 5% of the respective purchase price installments. The court, however, refused to admit this resolution in evidence over the objection of the defendant. Shaver denied that there was any agreement concerning his commission under the option of sale.

From January 19, 1923, to March 25, 1927, Shaver accepted 5% of the royalty installments when and as received by the lessor as payments on his commission, aggregating $50,319.90, executing in each instance a formal receipt for the amount of payment. The receipt for the first payment, the form of which was adhered to in the subsequent receipts, follows:

"THE CONSOLIDATED COAL COMPANY
INCORPORATED
NEW YORK, N. Y.

To S. L. Shaver, Dr.
Fairmont, W. Va.

Reg. in month of January 1923.

For the following amounts as per bills rendered.

Jan. 19 for commission on first quarterly royalty payment in connection with the J. A. Paisley lease, 5% of $87,584.69—$4,379.23.

Certified correct.

E. A. FRIEND, *Accountant.*

Approved for payment.

A. M. BOWLES, *General Auditor.*

Forty three hundred seventy nine and 23/100............Dollars
In settlement of the above account.

Receipt attached.

-------------------------------------------192........

Place       Date

Do not detach receipt from voucher. Please date, sign and
return if satisfactory, if not, return for correction.

New York, 19, 1923.

Received from The Consolidation Coal Company $4,379.23
being 5% of $87,584.69 as commission on first quarterly
royalty payment in connection with the J. A. Paisley lease.

C. L. SHAVER.''

On March 3, 1923, H. H. Snoderly, assistant secretary of
the defendant, mailed the plaintiff a memorandum of agree-
ment, in duplicate, executed by the defendant, fixing the
commission of Shaver at 5%. of the respective royalty in-
stallments when and as received by the lessor, with the re-
quest that he sign and return one of the copies. Shaver
refused to sign the paper, and in his letter of March 25,
1923, so advising Snoderly, said: ''Yours of the 3rd instant
enclosing proposed contract between your Company and my-
self relative to commission allowed me on Paisley matter
therein discussed received, and also yours of the 13th instant
relative to same matter. Now, after a careful consideration
of this matter as set forth in the paper you have enclosed,
signed by S. D. Camden, Vice President, and yourself As-
sistant Secretary of said Company, under date of March 3,
1923, it occurs to me that perhaps the contract is a little
more one sided than is fair to me. Inasmuch as I advanced
the price of the property mentioned in said Paisley lease
from the Consolidation from $400.00 per acre to the basic
price of $500.00 per acre, in all an advance of $1,000,000.00,
that my future position in the matter ought to be a little
more clearly defined than this paper sets forth, as I feel
that so long as that advance in price of a little more than
$1,000,000.00 stays in any future negotiations on said prop-
erty that my rights should in no wise be set aside. Therefore,

I am returning the paper unsigned with the idea that we may at a later date discuss the matter more fully.

Very truly yours,

C. L. SHAVER."

In his deposition taken in New York April 10, 1928, at the instance of the defendant, Paisley testified to various concessions obtained by the lessee from the lessor with the assistance of Shaver after the execution of the lease, including the waiver of royalties for 1926, 1927 and 1928. The deposition of Paisley, taken by the plaintiff in Cleveland, Ohio, November 5, 1928, was also introduced by the defendant. In this deposition, after detailing the negotiations between himself and Shaver, resulting in the lease, he was asked: "Now, for this work that Shaver was doing, that you have told in your main examination and you have told about in your cross-examination, did you have any agreement with Mr. Shaver, the plaintiff, about paying him?" He replied: "I did." He further stated that such agreement was evidenced by the following writing: "Mr. C. L. Shaver, Fairmont, West Virginia. Dear Sir: Referring to the deal recently closed between ourselves and The Consolidation Coal Mining Company for the lease of their Penmont properties together with mines No. 93 & 45. This is to certify that you or your heirs are to receive $750.00 per quarter for forty (40) quarters, no interest, for services rendered. The first quarter to start as of March 1st, 1923. Inasmuch as the March 1st payment was made to The Consolidation Coal Mining Company yesterday, we enclose you check herewith for $750.00, being the March 1st payment. It being further understood that this letter signed by myself is no way to be a contingent liability so far as I am personally concerned but that I am obligated to see that this agreement is to be made a part of the new Company which is to be organized to take over this field of coal. This letter written in duplicate

376

and your acknowledgment on one copy to be returned to me to complete our understanding.

Yours very truly,

J. A. PAISLEY.

Accepted: C. L. Shaver
Jany 22-1923.''

It appears that this paper was dictated by Paisley to a stenographer in the presence of Shaver on the day, and immediately after, the lease was executed; and that Shaver inserted the words "or your heirs" in the rough draft before the instrument was re-written and signed. Payments were made by Paisley to Shaver, as provided therein, until March 3, 1928. Denying that Paisley had agreed to pay him, or that he had received from Paisley any sum for services rendered him prior to the execution of the lease, Shaver testified that the quarterly payments were agreed upon as compensation for services to be rendered by him for the benefit of Paisley or the lessee, and that in pursuance of such agreement he had rendered valuable services to Paisley and The Morgantown Gas Coal Company in securing the various concessions from the lessor and performing other acts in connection with the lease. In corroboration of his testimony on this point, the plaintiff introduced, over the objection of defendant, a letter from Paisley to himself, dated April 10, 1928, reading: "It is to be regretted that conditions have changed so that the writer has not been able to carry out the lease with The Consolidation Coal Company. I feel that the contract with you, namely $750 per quarter for forty quarters was for services which you were to render from time to time in working out between us and Consolidation the necessary adjustments which would enable us to carry on. Now the question of payments of commissions you were to receive from The Consolidation Coal Company, being brought in the courts through suit brought by you has certainly closed the door, for further negotiations in our behalf through you. We also call your attention to the fact that you consulted the

Consolidation people and Attorney Tusca Morris in behalf of us to the end that they were to pay Judge Cox's fees in connection with the mining rights in the suit brought by the Continental Coal Company, his fees being one-half of $35,000.00. Won't you kindly advise how this matter now stands? I attach you herewith letter dated April 9th, written to Mr. Snoderly, whereby you will note we are obliged to run for cover. I feel in this connection that our Company's obligation with you should also cease. I would have liked to have had the door kept open trading up and down until matters would adjust themselves. Might it be that your bringing suit has worked the opposite from our understanding and your employment with us.

Yours very truly,

THE MORGANTOWN GAS COAL COMPANY<br>By J. A. PAISLEY."

The plaintiff adduced the testimony of nine witnesses to show the reasonable value of his services, which was later excluded by written instruction to the jury. Watson testified that practically all of the terms of the lease were worked out between Shaver and Paisley before he met Paisley; that he relied very largely upon the judgment of Shaver, who was entirely in the confidence of the defendant, and, to the extent that any agent could act, had full authority in the premises. He answered in the affirmative, however, a question on cross-examination as to whether he dictated the terms that should be proposed to Paisley from time to time. The following questions and answers appear in the direct examination of Shaver: "Q. You have been shown certain letters exchanged between you and Mr. Paisley while these various negotiations were on. The first being dated December 6, 1920, the second September 15, 1922, and the last November 15, 1922, in which you offered him advice in reference to this transaction. What was your reason for writing those letters? A. Trying to bring their minds, the minds of these people together, to bring about the sale of the coal. Q. In one of those letters you advised Mr. Paisley there was talk of an

offer of $600.00 an acre for this coal from other corporations. What was your reason for advising him that? A. I presume now to prompt him, if he wanted the property, to take it. Q. In other words, you were warming up the purchaser, is that it? A. Truly.'' He also denied in this connection that he was representing, or had received any compensation from, Paisley in the transaction.

In support of the writ, the defendant contends: (1) That the verdict is not warranted by the evidence; (2) that the plaintiff, having accepted as payments on his commission 5% of the royalty installments when and as received by the defendant for a period of four years, is estopped to assert a different basis of payment; (3) that the evidence tendered by plaintiff show the reasonable value of his services in negotiating the lease was improperly admitted; (4) that the jury were improperly directed in two instructions tendered by the plaintiff; (5) that the court committed reversible error in refusing instructions Nos. 3 and 5 offered by the defendant; (6) that the resolution adopted by defendant's board of directors October 27, 1920, authorizing the option to Paisley to purchase the property and fixing the amount and terms of payment of plaintiff's commission, should have been admitted; and (7) that the letter of April 10, 1928, from Paisley to Shaver was incompetent evidence.

Under the first assignment it is argued that the testimony of Watson concerning the contract is confirmed by the admitted facts and circumstances, chiefly among which, are the letter of Shaver, dated March 25, 1923, refusing to sign the contract in writing without stating his understanding of the parol agreement, and his acceptance by formal receipt over a period of four years of 5% of the royalty installments as payments on commission. It is true that these and other circumstances relied on by defendant may be considered as strengthening the testimony of Watson. They are not, however, in our judgment, of such conclusive character as to overthrow the verdict.

In considering the question of estoppel, it would seem to be a fair inference from the plaintiff's statement of the agreement that he was to be paid the percentage of his commission

from the royalty installments as received by the lessor for at least two or three years and as long thereafter as he did not demand full payment, although the lessee had performed satisfactorily to the lessor during the first "two or three years."

As the plaintiff sought to recover both on special contract and quantum meruit, the admission of evidence tending to show the reasonable value of his services, which was excluded after the evidence of both parties on the special contract had been presented, is not error.

Only two instructions were given in behalf of the plaintiff, each of which is complained of by the defendant.

Plaintiff's instruction No. 1. "The Court instructs the jury that if you believe from a preponderance of all the evidence in this case that the defendant, being the owner of the coal and other property mentioned in the declaration, employed the plaintiff as a broker to find, procure for and produce to the defendant a purchaser or lessee for the said property, upon terms and at a price to be agreed upon between the defendant and such purchaser or lessee; that the plaintiff found, procured for and produced to the defendant as such purchaser or lessee, one James A. Paisley; that the defendant accepted said Paisley as such purchaser or lessee, and executed to him the instrument filed as plaintiff's exhibit No. 9; then the plaintiff's contract with the defendant as such broker was fully performed and he was entitled to compensation for the services rendered; and unless the jury shall find from the evidence that the plaintiff and defendant had expressly otherwise agreed, the plaintiff's right to receive such compensation would not be impaired by any subsequent default on the part of said Paisley or of the Morgantown Gas Coal Company as his successor in title."

Plaintiff's instruction No. 2. "The Court further instructs the jury that if they believe from a preponderance of all the evidence in this case that the plaintiff, in assisting to bring about the lease or sale from the defendant to one James A. Paisley of the property mentioned in the declaration herein, and without knowledge of the defendant, rendered certain services on behalf of the said Paisley, with the understanding

that he would receive compensation therefor from said Paisley, and did in fact alone will not bar plaintiff's right to recover in this suit compensation from the defendant for his services as defendant's agent or broker in the same transaction, provided you further believe from a preponderance of all the evidence that the plaintiff in said transaction was a mere middleman, whose duties and authority, as regards both parties, were limited to bringing the defendant and said Paisley together, and that he had no duty or authority from either to fix or determine price or terms.''

The main points of criticism are that instruction No. 1, which is, in effect, a binding charge, ignores the defense of dual agency, and instruction No. 2 incorrectly defines a ''middleman''. A binding instruction in behalf of the plaintiff which ignores a material defense supported by substantial proof is erroneous. *Blackwood* v. *Monongahela Valley Traction Company,* 96 W. Va. 1; *Frank* v. *Monongahela Valley Traction Company,* 75 W. Va. 364. The error is not corrected by an instruction in behalf of the defendant properly submitting the issue.

Instruction No. 2, in effect, told the jury that no matter what services Shaver may have rendered in behalf of Paisley for which Paisley agreed to pay him compensation, he is not thereby barred from recovering against the defendant, if his ''duties and authority, as regards both parties, were limited to bringing the defendant and said Paisley together, and that he had no duty or authority from either to fix or determine price or terms.'' This is plainly an incorrect statement of the law. It is much more important to know what Shaver actually did in attempting to advance the interest of ''both parties'', than his actual duty or authority in the premises. ''It is the rule of law that, except with the free and intelligent consent of his principal, given after full knowledge of all of the circumstances, the agent cannot in the same transaction, *act* for his principal and the adverse party. If, therefore, without such consent, the agent *undertakes to also serve* the other party in the same transaction, he commits such a breach of his duty to his own principal, and so violates the rules of sound policy and morality, that he

forfeits all right to compensation from the principal who first employed him.'' Mechem on Agency, Vol. 1, page 1190. ''Inasmuch as a broker is in duty bound to refrain from secretly undertaking to represent interests adverse to those of his employer, it is unlawful for him to attempt to act in the capacity of broker for both sides to a negotiation without the knowledge and consent of each of them, and in the event of his doing so he is not entitled to be compensated by either.'' 4 R. C. L., page 328. ''This rule applies whether or not the principal is prejudiced by the double agency, and even though the transaction is advantageous to him.'' 9 C. J., page 567. The authorities are practically unanimous in holding that there is one notable exception to the rule, ''and that is to the effect that a broker employed as a mere middleman, or in other words, one engaged not to negotiate a sale or purchase, but simply to bring two parties together and permit them to make their own bargain, may recover an agreed compensation from either or both, though neither may know that compensation is expected from the other. A broker is simply a middleman, within the meaning of this exception, when he has no duty to perform but to bring the parties together, *leaving them to negotiate and come to an agreement themselves without any aid from him.* If he *takes,* or contracts to take, any part in the negotiations, however, he cannot be regarded as a mere middleman, no matter how slight a part it may be.'' 4 R. C. L., page 330. ''Where an agent is representing two or more principals of divergent and opposing interests, and from the nature of his employment they are entitled to his judgment, discretion or personal influence, he will not be permitted to act unless with their full knowledge and consent.'' *McDermott et al.* v. *Fairmont Gas & Light Company et als.,* 88 W. Va. 692, 706. There is little effort on the part of counsel to justify the instruction. They insist, however, that the evidence was insufficient to warrant the submission of the issue of dual agency, and that the instruction, even though incorrect in form, could not, therefore, have prejudiced the rights of the defendant.

Defendant's instruction No. 3, refused. ''If you believe from the evidence that the plaintiff and the defendant en-

tered into a verbal contract by which the defendant was to compensate the plaintiff for his services by paying him five per cent (5%) on the rents or royalties when and as received by the defendant, and further to pay to the plaintiff within two or three years after the 19th day of January, 1923, or at a reasonable time after said date, a further sum representing 5% on royalty payments thereafter to accrue, provided James A. Paisley or the Morgantown Gas Coal Company as his successor should substantially keep and perform the terms, covenants and conditions of their lease from The Consolidation Coal Company; and if you further believe that at the end of three years from the date of said lease the said Morgantown Gas Coal Company as lessee had become and persistently remained in default in the performance of the terms and conditions of said lease and owed the defendant $213,798.42, or other large sums of rent which it failed to pay, and failed and omitted to make investments of a permanent nature upon the leased premises as required by the contract; then and in such event you should not find for the plaintiff more than the unpaid balance of five per cent (5%) of the royalty payments actually received by the defendant prior to the institution of this suit.'' According to the records of the defendants, the lessee was in arrears about $150,000 for royalties, in addition to the accumulated interest on overdue installments, while the books of the Morgantown Gas Coal Company show an arrearage as of that date of about $70.000. The taxes on the property had been paid by the lessee and the construction of the shortage in improvements deferred by consent of the lessor. Under this instruction the jury would have been compelled to find from the delinquency in royalties disclosed by the books of the Morgantown Gas Coal Company that the lessee had not substantially performed the terms, covenants and conditions of the lease. This, in our opinion, was not such omission as to justify the legal conclusion of failure on the part of the lessee to substantially fulfill the requirements of the lease for ''two or three years''.

Defendant's instruction No. 5, refused. ''The jury are further instructed that if they find that shortly after the

19th day of January, 1923, it developed that the plaintiff and the defendant were not in the agreement as to the proper meaning and interpretation of the contract between them for the plaintiff's compensation and if the defendant advised the plaintiff of the exact nature of its interpretation of said contract by submitting a written form thereof to him for signature which written contract the plaintiff rejected and if thereafter with knowledge of the exact nature of the contract as claimed by the defendant, the plaintiff accepted compensation or commissions and received receipted vouchers therefor without protest, or without protest except in one particular, the plaintiff by his conduct has estopped himself to deny the propriety of the defendant's interpretation of the contract except in so far as, in receipting said vouchers he expressly dissented therefrom, and then only to the extent of his dissent.'' The facts recited in this instruction, as we have already stated, although proper to be considered by the jury as corroborating Watson, cannot be accepted as conclusively estopping the plaintiff from relying on his version of the contract.

It is established, as a general rule, that self-serving statements in the records of a corporation cannot be adduced by it in support of its claims against a stranger. The particular record, however, might be competent if assented to by the adverse party as the memorandum of a transaction between himself and the corporation. The testimony of Watson that he had, before its adoption, discussed with Shaver the resolution of October 27, 1920, and later advised him that it had been adopted, is not sufficient, in our opinion, to warrant its admission under the exception to the rule, in view of the inability of Watson to state definitely that he had called the attention of Shaver to that feature of the memorial fixing his commission and terms of payment.

The letter from Paisley to Shaver, dated April 10, 1928, was admitted without laying the foundation. This was error. It was purely hearsay, self-serving to the author, and inadmissible under any exception to the rule.

From the foregoing recital and conclusions it remains to be determined whether the defendant was prejudiced by the

erroneous rulings of the trial court in granting the plaintiff's instructions, and admitting the letter of April 10, 1928. It is insisted that no legal injury resulted to the defendant because (1) there was not sufficient evidence to carry to the jury the issue of dual agency, and (2) that the erroneous instructions were cured by proper instructions given on behalf of the defendant.

The majority of the Court, after thoroughly considering the record, are unable to say as a matter of law that Shaver acted merely as a "middleman", or that no relation of employment existed between him and Paisley prior to the execution of the lease.

As already indicated, plaintiff's instruction No. 2 positively and completely presents his theory of the law governing the defense of dual agency, and is, therefore, in the opinion of the majority of the Court in conflict with defendant's instructions Nos. 9 and 10 on the same issue, correctly stating the law. Generally, a complete positive instruction incorrectly stating the law governing a material point is not cured by another inconsistent instruction properly presenting the law applicable. *Stuck* v. *Kanawha etc. R. R. Co.*, 76 W. Va. 453. "A bad instruction is not cured by a good one given to the jury, and with which it is in conflict." *State* v. *Garner*, 97 W. Va. 222. JUDGE MILLER, speaking for the Court in that case, said: "It is true that an incomplete instruction, one which does not state the law fully, may be cured by other instructions given, and the defective one thus made whole, but a positively erroneous instruction, which may mislead the jury to the prejudice of the party affected, will not be cured by a good instruction." He also stated in the same opinion: "The reason for this salutary rule is that the court cannot tell which of the instructions the jury regarded, whether the good or the bad one, to the prejudice of the party affected thereby." Plaintiff's instruction No. 1 has been sufficiently considered.

For the reasons stated, the judgment will be reversed, the verdict set aside, and a new trial awarded the defendant.

*Judgment reversed; verdict set aside; new trial awarded.*

HATCHER, JUDGE, concurring:

The Bible declares that a man cannot serve two masters impartially. That declaration is based on the frailty of human nature and has become axiomatic. In recognition of the truth whereof the law does not permit an agent to serve two principals having divergent interests, "without the intelligent consent of both parties." *Ferguson* v. *Gouch*, 94 Va. 1. This inhibition is subject to the "notable exception" pointed out in the majority opinion. The leading case recognizing the exception is perhaps that of *Rupp* v. *Sampson*, (Mass.) 16 Gray 398, 77 Am. Dec. 416. In that case, after admitting the general rule, the court said of the broker: "He was not an agent to buy or sell but only acted as a middleman to bring the parties together in order to enable them to make their own contracts. He stood entirely indifferent between them and held no such relation in consequence of his agency as to render his action adverse to the interests of either party." The Massachusetts court, however, has been very careful not to expand the exception. It has adhered strictly to the general rule as propounded in the earlier Massachusetts case of *Farnsworth* v. *Hemmer*, 1 Allen 494, 79 Am. Dec. 756, in which it was said: "The duty of an agent for a vendor is to sell the property at the highest price; of the agent of the purchaser to buy it for the lowest. * * * It is of the essence of his contract that he will use his best skill and judgment to promote the interest of his employer. This he cannot do where he acts for two persons whose interests are essentially adverse." See *Walker* v. *Osgood*, 98 Mass. 348, 93 Am. Dec. 168, 170. While the exception is generally recognized, it has been accepted by the courts with some degree of caution. For example, the Supreme Court of Michigan said in *Scribner* v. *Collar*, 40 Mich. 375, 29 Am. Rep. 541, 543: "No doubt such cases may occur but their exceptional character should appear clearly before they should be exempted from the general principle." And in *Bell* v. *McConnel*, 37 Ohio State 396, 41 Am. Rep. 528, 531: "We admit that all such transactions should be regarded with suspicion." Cases strongly asserting the general rule

that an agent cannot represent both seller and purchaser where he takes any part whatever in negotiations between the two, unless with their consent, are ·our own case of *McDermott* v. *Gas & Light Co.*, 88 W. Va. 692, 706-7; *Rice* v. *Davis*, 136 Pa. 439, 20 Am. St. Rep. 931; *Jacobs* v. *Bayer*, 125 N. Y. Supp. 597.

Now the dissenting opinion assumes the position that if the plaintiff made no false representations to the defendant, if he did nothing (affirmatively) to deceive it, and if it knew the value and extent of his services to it, then the fact that he was also to receive compensation from the plaintiff is "wholly immaterial". But under the authorities cited herein and in the majority opinion, the tests formulated by the dissenting opinion do not fairly determine the right to compensation in cases of dual agency. Under those authorities the tests are not necessarily fraud by the agent or knowledge of his services by one of the parties, but either entire indifference by the agent or the knowledge of his dual representation by both parties. In this case the defendant had no information whatever that the plaintiff was serving Paisley during the negotiations leading up to the lease to him by defendant. The plaintiff makes no such claim. In fact he denies that he did represent Paisley prior to the execution of the lease. That denial, however, is inconsistent with the writing formally accepted by him from Paisley, immediately following the execution of the lease. That writing referred directly to the lease and promised payment by Paisley to plaintiff *or his heirs* of $750.00 quarterly for forty quarters ($30,000.00 in all) "for services rendered". Unless this writing is infected with a latent ambiguity (not yet detected), its qualification by parole is not admissible.

The dissenting opinion states that the plaintiff "acted only as a middleman to bring the parties together that they might make their own contracts". I respectfully submit that the following evidence of the plaintiff (see majority opinion) tends to the contrary:

(a) His statement in the letter to Paisley of December 6, 1920, "I am willing to go my limit when you really need and must have it."

(b) His statement in the letter to Paisley of September 15, 1922, relative to a tentative agreement as to the rate of interest Paisley's deferred payments to defendant were to bear. "We had considerable struggle then on that point, and doubt it advisable to try to change it."

(c) His conduct on November 15, 1922, in preparing a draft of letter for Paisley to send to the president of the defendant in regard to the lease.

(d) His testimony that his purpose in writing certain letters was "to bring their minds, the minds of these people together."

If plaintiff was ready *to go his limit* (in the ordinary sense of the phrase) for Paisley, it cannot be said he "stood indifferent" between Paisley and defendant. If plaintiff actually participated in the *struggle* (negotiations) between defendant and Paisley over the rate of interest Paisley was to pay (reduced by defendant at Paisley's insistence from six per cent to five per cent), then the plaintiff did not leave the parties "to negotiate and come to an agreement themselves without any aid from him." (See quotation of law in majority opinion.) The draft of letter furnished by plaintiff to Paisley for transmission to defendant's president seems now to have been of little importance. But is plaintiff's conduct in that regard consistent with strict neutrality? If he actually strove to bring together the minds of his two principals, then he did not "permit them to make their own bargain". If he went his limit for Paisley, if he actually entered into the negotiations as to the rate of interest, if he really strove to reconcile each party to the demands or concessions of the other, then he doffed the cloak of indifference which is the livery of a middleman.

Plaintiff's instruction No. 1 (for which see the majority opinion) is not mandatory in form, but is nevertheless binding in its effect. It told the jury that the plaintiff "was entitled to compensation for the services rendered" upon proof that he had been employed by defendant to find a purchaser for its property and had done so, thereby entirely ignoring as stated in the majority opinion the defense of

dual agency. Suppose it be admitted for the sake of argument that if plaintiff's instruction No. 2 be read in connection with defendant's instruction No. 10, then the error in No. 2 is corrected and the two instructions (together) "accurately presented" (according to the dissenting opinion) the defense of dual agency. That admission, however, contains no specific whatever for the malady which afflicts No. 1. The lack of harmony in the instructions (No. 1 on the one hand and Nos. 2 and 10 on the other) still exists, as was ably demonstrated in the majority opinion.

WOODS, PRESIDENT, dissenting:

A jury has found on the questions of fact in favor of the plaintiff. The learned trial judge has rendered judgment on the verdict. I would uphold that judgment. The parties dealing in this case (officers of The Consolidation Coal Company and Paisley) are men of large affairs. They reserved unto themselves all rights to fix terms, bestowing no power on Shaver, except that of bringing the parties together. While the law will not permit a party to act in a dual capacity of agent for principals having divergent interests, on the theory that he cannot possibly act impartially, yet it recognizes an exception in cases where the so-called agent simply brings the principals together, and the latter in turn make their own terms. In order to support such exception the intermediary must of necessity have a right to ascertain and present the proposition of one principal to the other and vice versa.

None of the facts set out in the Court's opinion, according to my view, in the light of the contract with Shaver, tend to establish dual agency. The ground of complaint of the defendant would have stood on a very different basis had Shaver been employed to option or sell the coal lands in question. In such case it would have been a fraud for him to conceal his agency for one from the other. This is on the principle that the interests of the buyer and seller are naturally adverse. But the plaintiff here did not act in any such capacity. He was not an agent to buy or sell the lands but acted only

as a middleman to bring the parties together that they might make their own contracts. This position finds abundant sanction in our decisions. *McDermott* v. *Gas Co.*, 88 W. Va. 692; *Runnion* v. *Morrison*, 71 W. Va. 254.

On the record the jury might well have found that there was nothing in the conduct of the plaintiff which operated to deceive the representatives of the defendant company in making the agreement to pay him for his services; that he made no false representations to them; and that they knew the nature of his services and the value thereof, and the extent that such were beneficial to the defendant. It is wholly immaterial under these circumstances that Shaver was to receive compensation from Paisley. It might be well found that Shaver's services were of value to both parties, and that each might be willing to pay according to the benefit received.

The plaintiff, under the facts in this case, held no relation with the parties so as to render his actions adverse to the interests of the other party. But, however, assuming that there was sufficient evidence to go to the jury on the theory of dual agency, this distinction was taken at the trial and accurately stated in instruction No. 10, given for the defendant company. It reads: "If you believe from the evidence that while the plaintiff was negotiating the lease to James A. Paisley as agent for the defendant said plaintiff was also acting as agent for hire for said James A. Paisley in the same transaction and that the plaintiff did not disclose the fact of his agency for Paisley to the defendant and that the defendant did not learn of such agency until after the 25th day of September, 1927, and if you further believe that in the negotiation of said lease the interests of The Consolidation Coal Company and said James A. Paisley were divergent and opposite and if you believe that The Consolidation Coal Company was entitled to have the entire benefit of the judgment, discretion and personal influence of said Clement L. Shaver, then and in any such event the defendant is entitled to recover in this case from the plaintiff the sums of money heretofore paid by the defendant to the plaintiff as

commission in ignorance of such dual agency and your verdict should be for the defendant in the amount of such commissions so received by the plaintiff, that is to say, the sum of $50,319.90.''

The foregoing instruction when read in conjunction with Nos. 1 and 2, given for the plaintiff, accurately presented the theories of each litigant to the jury. In the plaintiff's instruction No. 2 the services rendered by the plaintiff were depicted as those of a middleman. The quoted instruction deals with those elements which would make plaintiff more than a middleman. It is a trite rule in this jurisdiction that instructions are to be regarded as a unit and the omissions of one may be supplied by the contents of another. Equally true is it that each instruction need not cover all the issues and state all the law relating to the controversy. Very much the same situation as to instructions was dealt with in *Runnion* v. *Morrison, supra.* There the Court said: ''But we observe, the court did in fact, instruct the jury in four other instructions, * * * as to the manner in which an agent, or broker, acting for both buyer and seller, might deprive himself of his rights to compensation. So that, reading all the instructions together, we do not think there could have been any doubt or confusion in the minds of the jury concerning the law of the case.'' When this is done in the instant case, the fact that plaintiff's instruction No. 1 may have ignored the affirmative defense of the defendants and No. 2 may have fallen short of defining duties of a middleman is not error for which the case should be reversed. The case made on this record, as I view it, cannot be better expressed than to use the language of this Court in *Peters* v. *Riley,* 73 W. Va. 791: ''The evidence does not establish or tend to prove any agency other than that of mere brokerage. The plaintiff was not authorized by the defendant to make a contract of sale for him. All the essential elements of the contract remained in the sole and exclusive control of the defendant. The plaintiff was a mere intermediary, having no power or authority to do more than to find a purchaser and bring the parties together to formulate their own contract

and fix its terms and conditions. In such a case, the acceptance of compensation from both parties is unobjectionable."