**MYER et al.**

v.

**PREFERRED CREDIT, INC. et al.**

Court of Common Pleas of Ohio,
Harrison County.

No. 98–424–CV.

Decided March 27, 2001.

12

14

16

Gary M. Smith and Robert C. Johns, for plaintiffs.

Robert J. Morje, for defendants.

WILLIAM F. CHINNOCK, Judge.

{¶ 1}   This case involves claims for breach of fiduciary duty, violation of the Ohio mortgage brokers Act, and breach of contract.   For the reasons specified below, judgment is rendered in favor of plaintiffs and against defendants on all claims.

### I. The Claims

{¶ 2} Plaintiffs William and Betty Myer ("the Myers") complain of actions taken between July and October 1995 by defendant mortgage broker Preferred Credit, Inc. ("PCI"). At that time, the Myers were in their mid–60s and had lived all their lives in rural southeastern Ohio. For about six years, they had lived on a farm they inherited from Betty's family. William operated the farm while Betty worked full-time as a cook at the local community hospital. The Myers income for 1994 was about $13,500, consisting of $12,000 earned by Betty as a cook, and $1,500 earned by William as a farmer. Medical expenses caused the Myers to fall behind in their monthly bills, including their $639 residential mortgage payment @ 19% and their $184 payment on the farm pick-up truck @ 16%. These monthly payments totaling $823 left them $302 a month to cover all their other necessities. PCI's representative testified that the Myers were in a "world of hurt" financially. William and Betty have little formal education, neither having graduated from high school. Nor had either of them ever been involved in a mortgage transaction with a mortgage broker. The evidence demonstrates that the Myers are simple and honest rural people who are naive in worldly affairs and unsophisticated in matters of finance.

{¶ 3} In 1995, defendants Preferred Credit and/or Ken Kline d.b.a Preferred Credit, operated a mortgage broker firm out of Columbus, Ohio, that was later incorporated in November 1997 as Preferred Credit, Inc., and which continued to operate as a successor-in-interest company. All defendants are referred to jointly as "PCI."

{¶ 4} The Myers complain that PCI made fraudulent promises regarding the rate of interest on their refinancing loan, and failed to make full disclosure regarding essential terms of the refinancing loan. Specifically, the Myers complain that PCI made fraudulent promises to them by a "bait and switch" method of solicitation, initially promising them an 8.75% interest rate, then increasing it in increments to 9.5%—10.5%, then 9.9%, then 11.6%, with a final interest rate of 13.35%. They also complain that PCI's initial letter of solicitation to them was deceptive in that it implied that they had been pre-approved for a refinancing loan at an 8.75% interest rate, when in fact it had no knowledge regarding their creditworthiness, the availability to them of a refinancing loan, or the interest rate for such a loan if available. They further allege that PCI promised to save them money by refinancing, but that over the life of the refinancing loan, payments totaled about $47,000 more than the two loans it replaced. The Myers further complain that PCI failed to disclose to them certain basic terms of the approximately $50,000 refinancing loan from Ford Consumer Financial ("FCF") that it secured for them as their agent, including (a) the rate of interest, (b) its non-amortization ("interest only") nature, and (c) the ten-year

balloon payment that is only about $1,500 less than the original amount of the loan.

{¶ 5} PCI responds that its discussions of various interest rates with the Myers throughout the three-month period of refinancing do not constitute "promises," but merely reflected the best rates available based upon the continuing accumulation of information regarding their creditworthiness. It answers that its letter of solicitation is not deceptive because it does not contain a statement of fact regarding pre-approval for a refinancing loan. It replies that the final interest rate it obtained for the Myers was 11.6%; that without its knowledge and for reasons unknown to it, FCF increased the rate to 13.35% immediately before closing; that the Myers consented to the increased interest rate at closing by initialing the change on the note; that it was unaware of this change because it was not present at closing and the Myers never brought the change to its attention. It rebuts that the Myers should not have agreed to the increased interest rate at closing, and that in any event if they had complained to it even after consenting to the increased interest rate at closing, it would have advised them to rescind the agreement within the three-day rescission period, and then it would have forced FCF to honor the 11.6% interest rate, but it could not do so because the Myers never complained to it after closing.

{¶ 6} The Myers also complain that PCI failed to disclose to them that it engaged in a dual agency with them and the lender, and further failed to disclose to them that it received a secret profit or "kickback" of $995 from the lender, Ford Consumer Credit ("FCF"), now known as Associates Financial Services, Inc.

{¶ 7} PCI responds to the "kickback" allegation that it is common practice in the mortgage brokerage industry for a broker to receive several forms of payment from lenders. The first form of payment is called a "yield-spread premium" where the broker has its borrower agree to an interest rate higher than the rate at which the lender is willing to accept, and in return the broker receives a percentage of the difference from the lender, sometimes without the knowledge or consent of the borrower. The second form of payment is called a "servicing premium," which allegedly is received from the lender in return for the broker performing certain services for the lender in connection with the loan, such as providing a "complete loan package."

## II.   The Trial

{¶ 8} The trial consisted of the testimony of Betty Myers and the representative for PCI with whom the Myers dealt with regarding the refinancing transaction. William Myers was unavailable to testify due to ill health. In the interests of clarity, the court will use approximate rather than actual dollar figures.

{¶ 9} The June 1995 letter of solicitation from PCI to the Myers states: "The county courthouse records indicate you may be paying a much higher than market rate of interest on your first or second home mortgage loan. We would like the opportunity to do a free credit analysis and see how much we can save you with an 8.75% interest rate. We have saved people several thousand dollars in the past just by switching debts to lower rates. Please call for a free consultation."

{¶ 10} The July 1995 letter from PCI to the Myers lists their bank debts totaling $42,350, a $3,000 (7%) loan fee, and a $650 appraisal fee, for a total of $46,000. The final gross sum of the refinancing loan was $3,800 higher ($49,800), including about $4,900 in credit life insurance to FCF. It also contrasted their existing $873 monthly payment on their bank debts to a refinanced 9.9% ten-year monthly payment of $604 and a fifteen-year monthly payment of $491.

{¶ 11} The Myers signed the $49,800 refinancing note at closing on October 3, 1995. From the loan proceeds, their mortgage and truck lien were paid, as well as $8,100 in loan costs and expenses, including a $4,900 lump-sum credit life insurance payment to FCF. Loan costs and expenses equaled almost 20% of the sum of the loan. In April 1996, about seven months after closing, the Myers again refinanced with FCF, without the involvement of PCI, paid off the balance of the first FCF loan and added another $6,300 in refinancing costs and expenses, including a loan origination fee of $2,700 and $3,000 for credit life insurance to FCF. In March 1997, about a year after the second refinancing, the Myers refinanced a third time with FCF, without the involvement of PCI, paying off the balance of the second loan and incurring another $8,599 in refinancing costs and expenses, including a loan origination fee of $3,000 and $4,700 for credit life insurance to FCF.

{¶ 12} Thus, through three refinances with FCF over a period of about eighteen months, the Myers increased their mortgage debt by about $18,000—from $41,700 to $59,700—an increase equaling over 43% of their original debt. In addition, the final balloon payment after the third refinancing was $56,600, whereas on the original mortgage there was no balloon payment due at the end of the term. The Myers would have been almost eighty years old when the $39,900 balloon payment of the first refinancing loan would have become due. There is no indication in the record whether FCF returned to or credited the Myers with the unearned portions of the 1995 and 1996 credit life insurance premiums totaling $7,900. Although this court makes no determination regarding the propriety of the FCF loans, since such determination would be irrelevant for the purposes of determining the validity of the complaints made by the Myers against PCI, even a cursory review of these refinancings leads to the inescapable

conclusion that the Myers are naive and unsophisticated to an extreme, which determination is relevant to the issues of the case.

{¶ 13} The evidence is undisputed that PCI's representative was acting within the scope of his employment in this transaction. "The general rule is that a principal is liable for frauds of his agent when committed within the scope of employment. It can no longer be disputed that the principal may be held for the fraud of his agent, though wholly ignorant of the fact that fraud was committed, if committed within the scope of his authority."[1]

{¶ 14} PCI operates in Ohio and six other states. Its gross annual income from its Columbus office where it employs between 13 and 15 people and annually closes 500 to 700 refinancings was between $400,000 and $500,000 in 1999. Its 1997, 1998, and 1999 corporate income tax returns show average annual gross income of almost $1.7 million. The record demonstrates that it is essentially the "same entity as that which preceded it [and is not] a new and independent [company]." It is a "mere continuation" of the former company. As such, it is a successor-in-interest, and may be liable on the claims herein.[2]

### III. Breach of Fiduciary Duty Claim

{¶ 15} The fiduciary owes a duty of the most perfect and scrupulous good faith ("uberrima fides") to his principal.[3] As noted by the Ohio Supreme Court:

{¶ 16} "The law is jealous to see that a trustee [fiduciary] shall not engage in double dealing to his own advantage and profit. The reason is not difficult to discover when it is remembered that a trusteeship [fiduciary] is primarily and of necessity a position of trust and confidence, and that it offers an opportunity, if not a temptation, to disloyalty and self-aggrandizement. The connotation of the word and name 'trustee' ['fiduciary'] carries the idea of a confidential relationship, calling for scrupulous integrity and fair dealing."[4]

{¶ 17} It is axiomatic that "[a]ll the power, influence, and skill of one occupying such a relation [fiduciary] is to be used for the advantage of the [principal], and not for the personal gain [of the fiduciary]."[5]

---

1. 51 Ohio Jurisprudence 3d (1984) 29, Fraud and Deceit, Section 173.

2. Kirchner & Wiseman, Punitive Damages, Section 22.01 et seq.

3. 43 Words & Phrases (1969) 1.

4. *In re Estate of Binder* (1940), 137 Ohio St. 26, 37–38, 17 O.O. 364, 27 N.E.2d 939.

5. *Berkmeyer v. Kellerman* (1877), 32 Ohio St. 239, 1877 WL 114, paragraph two of the syllabus.

{¶ 18} As comprehensively declared by an Ohio appellate court: "The term 'fiduciary' * * * involves the idea of trust, confidence. It refers to the integrity—the fidelity of the party trusted, rather than his credit or ability. It contemplates good faith, rather than legal obligation, as the basis of the transaction. * * * The very existence of such a relation precludes the party in whom the trust and confidence is reposed from participating in profit or advantage resulting from the dealings of the parties to the relation[ship]." [6]

{¶ 19} Defendants in the case at bar, as agents of plaintiffs, are fiduciaries and owe plaintiffs the duties of fiduciaries in the transaction in issue. "The liabilities of a broker to his [principal] are those of an agent. The relation of principal and agent is always regarded by the court as a fiduciary one, implying trust and confidence." [7]

{¶ 20} Hornbook law reveals that a fiduciary owes several distinct and significant duties to his principal, including *(a) the duty of full disclosure, and (b) the duty of good faith and loyalty.*

{¶ 21} Black-letter law regarding the duty of full disclosure specifies:

{¶ 22} "A broker is under a legal obligation to make a full, fair, and prompt disclosure to his principal of all facts within his knowledge which are or may be material to the matter in connection with which the agency relationship was established, which might affect his principal's rights and interests or influence his action in relation to that matter." [8]

{¶ 23} Fiduciaries must disclose material facts to their principals. "Fiduciary status imposes on an agent an affirmative duty to inform the principal of all of the facts relating to the subject matter of the agency that affects the principal's interest. * * * A fact is material if it is one which the fiduciary should realize would be likely to affect the judgment of the principal in giving consent to enter into the particular transaction on the specified terms. * * * When agents intentionally conceal material facts or secure to themselves enrichment directly proceeding from their fiduciary position, agreements accompanying such conduct are fraudulent and may be set aside." "No agent is permitted to benefit by a failure to perform the full duty in representing the principal." [9]

---

6. *State ex rel. Shriver v. Ellis* (Belmont App.1946), 75 N.E.2d 704, 710.

7. 10 Ohio Jurisprudence 3d (1995) 96, Brokers, Section 116.

8. 10 Ohio Jurisprudence 3d (1995) 99, Brokers, Section 119.

9. 3 Ohio Jurisprudence 3d (1998) 136, 134, Agency, Sections 117, 115.

{¶ 24} Fiduciaries must make full disclosure to their principals. "Ohio courts have long held that where parties dealing directly stand toward each other in a fiduciary or quasi fiduciary relation, the obligation not only to abstain from false suggestions, but to make full disclosure, is imperative." [10]

{¶ 25} Black-letter law regarding the duty of good faith and loyalty specifies:

{¶ 26} "A fiduciary owes the duty of good faith and loyalty to his principal. * * * A fiduciary must act in accordance with the highest standard of integrity, with utmost good faith, and with scrupulous openness, fairness, and honesty, and a court of equity can and will require such behavior. * * * Abuse of a relation of trust or confidence for personal aggrandizement is the cardinal sin of a fiduciary, and courts are quick to denounce, prevent, or remedy any such action * * *. A fiduciary owes the duty of undivided loyalty. He cannot serve two masters." [11]

{¶ 27} "A broker owes a special duty of fair dealing where he is acting for an inexperienced or aged principal." [12]

{¶ 28} The fiduciary's duty of good faith and loyalty in turn prohibits (a) dual representation, and (b) self-dealing. The duty of good faith and loyalty prohibits dual representation without the full knowledge and consent of both principals. As noted in a major legal encyclopedia: "An agent is subject to a duty not to act ... for persons whose interests conflict with those of the principal in matters in which the agent is employed; the agent also has a duty not to act on behalf of an adverse party without the principal's knowledge. A [fiduciary] cannot act for persons who have interests adverse to those of his [principal], without violating the general duty of good faith owed by an agent to a principal, unless the [principal] has full knowledge of the facts and consents to the arrangement." [13] "A [fiduciary] cannot in good faith act for persons having interests adverse to those of his [principal], unless he acts with the consent of his [principal] given with knowledge of the facts." [14]

{¶ 29} The duty of good faith and loyalty also prohibits self-dealing. Black-letter law regarding self-dealing states:

---

10. 50 Ohio Jurisprudence 3d (1984) 432, Fraud and Deceit, Section 79.

11. 49 Ohio Jurisprudence 3d (1984) 66, 71, Fiduciaries, Section 13.

12. 12 Corpus Juris Secundum (1980) 169, Brokers, Section 56.

13. 12 American Jurisprudence 2d (1997) 743, Brokers, Section 112.

14. 10 Ohio Jurisprudence 3d (1995) 101, Brokers, Section 120.

{¶ 30} "[T]he law is strict in seeing that a fiduciary shall act for the benefit of the person to whom he stands in a relation of trust and confidence and in maintaining the trust free from the pollution of self-seeking on the part of the fiduciary. * * * Thus, an agent may not, acting as such, make a secret personal profit out of any transaction wherein he acts, or should act, for his principal."[15]

{¶ 31} Self-dealing is aptly described as follows: "Basically, self-dealing relates to transactions wherein a [fiduciary], acting for himself and also as [fiduciary], a relation which demands strict fidelity to others, seeks to consummate a deal wherein self-interest is opposed to duty. * * * Equity, in such cases, pauses not to inquire, whether the [principal] has sustained a loss."[16]

{¶ 32} Courts throughout the United States have been virtually unanimous in their enunciation and adoption of the rule that a secret fee-splitting agreement between brokers representing adverse parties in a transaction constitutes a breach of fiduciary duty and precludes either broker from recovering a commission. The fact that the principal is not actually injured does not prevent application of the rule, since *the "secret profit" rule is not intended to be remedial of actual harm, but rather is intended to prevent fee-splitting agreements without the knowledge or consent of the principal and to secure fidelity in the discharge of fiduciary duties.*[17] "The rule does not depend upon whether or not the principal is injured by the conduct of the agent. The wholesome rule is that the agent shall not put himself in a position where he may be tempted to betray his principal, or to serve himself at the expense of his principal."[18] "A [fiduciary] is under a fiduciary duty to affirmatively disclose to his principal a commission splitting arrangement between himself and a purchaser of the principal's property, unless such principal has knowledge of the agreement prior to the closing."[19]

{¶ 33} *Not many rules of law are as entrenched or honored in our system of justice in the United States as are the fiduciary's duty of full disclosure and the fiduciary's duty of good faith and loyalty. Bell v. McConnell (1881), 37 Ohio St. 396 [1881 WL 118]. The Ohio Supreme Court decision in Bell v. McConnell has been cited and followed not only in Ohio but also by numerous sister courts of*

---

15. 49 Ohio Jurisprudence 3d (1984) 191, Fiduciaries, Section 94.

16. *In re Estate of Binder* (1940), 137 Ohio St. 26, 17 O.O. 364, 27 N.E.2d 939, citing *First Natl. Bank of Birmingham v. Basham* (1939), 238 Ala. 500, 191 So. 873, 125 A.L.R. 656.

17. 63 A.L.R.3d (1975) 1211, at 1216, 1975 WL 37110.

18. *Greenberg v. Meyer* (1977), 50 Ohio App.2d 381, 384, 4 O.O.3d 353, 363 N.E.2d 779, citing *Pagel v. Creasy* (1916), 6 Ohio App. 199, 206, 1916 WL 1301.

19. *Case v. Business Centers, Inc.* (1976), 48 Ohio App.2d 267, 2 O.O.3d 229, 357 N.E.2d 47, at paragraph two of the syllabus.

**26**

*appeals and supreme courts, including those in the states of California, Colorado, Connecticut, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New York, North Dakota, Oklahoma, Oregon, Utah, Vermont, and Washington.*[20]

---

**20.** *Capener v. Hogan* (1883), 40 Ohio St. 203, 1883 WL 75 (Fiduciary "could not recover from either principal unless both assented to his double agency"); *Greenberg v. Meyer* (Hamilton App.1977), 50 Ohio App.2d 381, 4 O.O.3d 353, 363 N.E.2d 779 ("Based upon considerations of public policy, the rule [of loyalty] does not depend upon whether or not the principal is injured by the conduct of the agent. The wholesome rule is that the agent shall not put himself in a position where he may be tempted to betray his principal, or to serve himself at the expense of his principal."); *Cozine v. Goodman* (Hamilton App.1939), 30 Ohio Law Abs. 703, 1939 WL 3293 ("The law is as pronounced in the case of *Bell v. McConnell.* * * *. '[A] double agency * * * involves, prima facie, inconsistent duties.' "); *Pagel v. Creasy* (Hamilton App.1916), 6 Ohio App. 199 ("The law does not suffer one who is an agent * * * to have an interest in [the] contract * * * or to earn any profit thereby outside of his regular compensation, unless it is done with the knowledge and consent of both principals."); *Tuke & Son v. Burkhardt* (Ohio Mun.1958), 7 O.O.2d 324, 156 N.E.2d 490 ("[T]he agent is bound to serve [his principal] with all his skill, judgment and discretion. The agent cannot divide this duty and give part to another. * * * [I]f a dual agency exists * * * the question is whether [the agent] places himself in a position where he is tempted not to render the full quantum of service contracted for."); *Findlay v. Pertz* (C.A.6, 1895), 66 F. 427, 434–435 (A dual agency where one of the principals has no knowledge of dual character "is pernicious and corrupt * * *. This principle is founded upon the plainest principles of reason and morality, and has been sanctioned by the courts in innumerable cases. 'It has its foundation in the very constitution of our nature,' * * * 'for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well-regulated system of jurisprudence prevails.' * * * The tendency of such agreement is to corrupt the fidelity of the agent, and is a fraud upon his principal * * * 'even though it does not induce the agent to act corruptly.' * * * The conflict created between duty and interest is utterly vicious, unspeakably pernicious, and an unmixed evil. Justice, morality, and public policy unite in condemning such contracts * * * "); *Harten v. Loffler* (U.S.App.1908), 31 App.D.C. 362, 1908 U.S.App. LEXIS 5632 ("These [dual agency] duties are so irreconcilable and conflicting that they cannot be performed by the same agent without danger that he will sacrifice the interests of one to the other, or both to his own. * * * If he so acts as the agent of each without the knowledge of both, he is clearly guilty of a breach of his contract, and commits a fraud by his concealment"); *Patterson v. De Haven* (1928), 88 Cal.App. 418, 263 P. 568 ("The law is well-settled that one who * * * assumes to act as an agent for another, is bound to the utmost good-faith, and cannot make any secret profits or take any advantage of his position as such agent for his own benefit. * * * 'Several reasons may be given for this rule. In law as in morals, it may be stated that as a principle, "no servant can serve two masters, for either he will hate the one and love the other, or else he will hold to the one and despise the other." ' "); *Collins v. McClurg* (1892), 1 Colo.App. 348, 29 P. 299 ("It is the purpose of the courts to see that the agent by reason of the confidence reposed in him by the principal secures to himself no advantage from the contract, and when the transaction is seasonably challenged a presumption of its own invalidity arises."); *Pentino v. Gallo* (1928), 107 Conn. 242, 140 A. 105 (quoting *Bell v. McConnell* as a "sound and well-established" opinion); *Twiss v. Herbst* (1920), 95 Conn. 273, 276–277, 111 A. 201 (" 'A recognized rule of public policy forbids * * * agents generally, to act for both parties to a transaction, in the absence of their knowledge that he is so acting and their express or implied assent thereto.' * * * The agent cannot serve two masters in the same transaction. * * * [I]f an agent of two adverse principals is honest, the utmost he can do is to be impartial; but impartiality is exactly the qualification which is inconsistent with agency. The agent is chosen to be a partisan of his principal, not an

impartial arbitrator between him and some one else."); *Bowers & King v. Roth* (1920), 189 Iowa 1264, 1266, 179 N.W. 859 (" 'The reason for the rule is that [the agent] thereby puts himself in a position where his duty to one conflicts with his duty to the other, where his own interests tempt him to be unfaithful to both principals, a position which is against sound public policy and good morals. * * * It is no answer * * * to say that he did, in the particular case, act fairly and honorably to both. The infirmity of his contract does not arise from his actual conduct in the given case, but from the policy of the law, which will not allow a man to gain anything from a relation so conducive to bad faith and double-dealing.' "); *Casady v. Carraher* (1903), 119 Iowa 500, 502, 93 N.W. 386 ("Fidelity in the agent is what is aimed at, and, as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal. This doctrine * * * 'has its foundation not so much in the commission of actual fraud, as in that profound knowledge of the human heart which dictated that hallowed petition, "Lead us not into temptation, but deliver us from evil," and that caused the announcement of the infallible truth that "a man cannot serve two masters." ' "); *Crawford v. Sur. Invest. Co.* (1914), 91 Kan. 748, 753, 139 P. 481 ("A party will not be permitted to escape the consequences of his fraudulent conduct [of dual agency] on the plea that he thought he was acting within his rights in a transaction contrary to sound morals and forbidden by public policy. * * * ' "Rules of law * * * intended to be preventive of the possibility of wrong, rather than remedial of actual wrong, should be rigidly enforced." ' "); *Alvord v. Cook* (1899), 174 Mass. 120, 126, 54 N.E. 499 ("The general rule is well established that when the individual interests of the broker in the transaction are antagonistic to those of his principal, * * * he is not in a situation to perform his full duty to his employer, and his failure to inform his employer of the fact is a fraud upon [the principal.]"); *McDonald v. Maltz* (1892), 94 Mich. 172, 175, 53 N.W. 1058 (" '[W]here the double employment exists, and is not known, no recovery can be had against the party kept in ignorance; and the result is not made to turn upon the presence or absence of designed duplicity and fraud, but is a consequence of established policy.' "); *Olson v. Pettibone* (1926), 168 Minn. 414, 417, 210 N.W. 149 ("An agent stands in a fiduciary relation to his principal and cannot be allowed to assume a position which might influence him to antagonize the interests of his employer. A person cannot serve two masters having opposing interests in a transaction."); *Northwestern Natl. Bank of Great Falls v. Great Falls Opera–House Co.* (1899), 23 Mont. 1, 10–11, 57 P. 440 (" 'Loyalty to his trust is the first duty which the agent owes to his principal. Without it the perfect relation cannot exist. Reliance upon the agent's integrity, fidelity, and capacity is the moving consideration in the creation of all agencies. * * * [T]he law looks with jealous eyes * * * and condemns, not only as invalid as to the principal, but as repugnant to the public policy, everything which tends to destroy that reliance.' * * * 'Contracts which are opposed to open, upright, and fair dealing are opposed to public policy. A contract by which one is placed under a direct inducement to violate the confidence reposed in him by another is of this character.' "); *Strawbridge v. Swan* (1895), 43 Neb. 781, 787, 62 N.W. 199 ("A real estate agent [who has acted for both parties to an exchange of property can recover] compensation [from both parties] only when [his] services [have been] limited to bringing together parties * * * and even this limited [right to compensation does not exist as against a party who in advance did not know of and assent to the agent's] dual employment."); *Auerbach v. Curie* (App.Div.1907), 119 A.D. 175, 104 N.Y.S. 233 ("secret agreement" for dual representation is "against good morals and public policy"); *Goodell v. Hurlbut* (App.Div.1896), 5 A.D. 77, 38 N.Y.S. 749 (An agent cannot be allowed to act on his own behalf with a third party, with whom he is negotiating for his principal, in a matter in which he has undertaken to act for his principal. The principal is entitled to the services of his agent uninfluenced by any hope of reward or advantage from the person with whom the agent is dealing for his principal. This rule is in the interests of public policy and should be strictly enforced); *Mees v. Grewer* (1932), 63 N.D. 74, 75, 79, 245 N.W. 813 (The paramount and vital principle of all agencies is good faith. " '[A]ll acts of an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed, and are not only invalid as to the principal, but are also against public policy.' " All contracts are illegal if their object or tendency is to cause unfaithful conduct by a fiduciary.); *Peaden v. Marler* (1920), 78 Okla. 200, 189 P. 741 ("Where real estate brokers representing adverse interests in the exchange of real estate agreed to pool

{¶ 34}   It should be noted that the fiduciary could avoid violating both its duty of full disclosure and its duty of good faith and loyalty simply by telling his principal of the dual representation and any payments expected to be paid to it by the other party.   The obvious reason why this is not done is because such disclosure is likely to give rise to uncertainty in the mind of the principal as to where the loyalties of the fiduciary lie and may result in termination of the relationship.   The principal is likely to conclude that he has been "double-crossed" by the double representation and secret profit.

{¶ 35}   Regarding the Myers' allegation of breach of fiduciary duty concerning the interest rate, the court finds that the solicitation letter is not deceptive in that it does not contain a statement of fact regarding a pre-approved refinancing loan.   The hypothetical "reasonable man" would not read into it an implication of a pre-approved loan.   The court finds further that the interest rates of 8.75% and 9.9% mentioned in the solicitation letter and followup letter do not constitute "promises" of loans available at those rates, nor a "promise" by

---

and divide their respective commissions, according to a pre-arranged plan, their agreement is void as against public policy, and they can recover compensation from neither, unless such arrangement was known and assented to by both principals." [West headnote.]); *Whitney v. Bissell* (1915), 75 Ore. 28, 146 P. 141 (a dual agency "is a fraud of the rights" of the principal because "such employment would be a temptation to the agent not to give his best efforts" to the principal); *Mills v. Gray* (1917), 50 Utah 224, 167 P. 358 (it is contrary to public policy for agent to act for and receive commissions from both parties to the same transaction unless they are fully informed and assent thereto.   " 'It is contrary to public policy to allow the broker a right of action against both parties for his commissions, and it is well settled that he does not have such right, although he may have acted in good faith; and evidence cannot be introduced to show a custom or usage among brokers to charge a commission to both parties in such cases.' "); *Leno v. Stewart* (1915), 89 Vt. 286, 289, 95 A. 539 ("The law requires the utmost good faith and loyalty from agents, for the furtherance and advancement of the interests of their principals.   * * * The plaintiff's actions did not meet this requirement when, without the consent of the parties, he accepted employment by both * * *.   In such circumstances, the interests of each principal were in danger of prejudice from the adverse interest in the agent. The twofold interests and relations of the plaintiff were inconsistent with the interests of both sides, and he had no right to be engaged by both without their knowledge and consent."); *Brandt v. Koepnick* (1970), 2 Wash.App. 671, 674, 469 P.2d 189 ("This dual agency relationship, while extremely delicate, is permissible when both parties have full knowledge of the facts and consent thereto.   * * * The duty of care owed to each by the dual agent is to exercise the same good faith and loyalty to both principals and to make the same full and truthful disclosure of all known facts, or facts discoverable, in the exercise of reasonable diligence that are likely to affect either principal's interest and action."); *Shaver v. Consol. Coal Co.* (1929), 108 W.Va. 365, 151 S.E. 326 ("The Bible declares that a man cannot serve two masters impartially.   That declaration is based on the frailty of human nature and has become axiomatic.   In recognition of the truth whereof the law does not permit an agent to serve two principals having divergent interests, 'without the intelligent consent of both parties.'   'It is of the essence of his contract that he will use his best skill and judgment to promote the interest of his [principal].   This he cannot do where he acts for two persons whose interests are essentially adverse.' " [Hatcher, J., concurring.]).

PCI that it will "save money" for the Myers. The evidence demonstrates that the change in interest rate from PCI's 11.6% to FCF's 13.35% was made without the knowledge or consent of PCI, and that the Myers consented to it by initialing the rate change on the note at closing. The evidence further demonstrates, contrary to the testimony of PCI's agent, that the Myers did contact PCI immediately after closing to complain about the interest rate change to 13.35%. Although PCI should have taken remedial action at that time, nevertheless, the evidence does not demonstrate that its failure to do so constitutes action meeting the essential elements of any of the claims in this case.

{¶ 36} Regarding the Myers' allegation of failure to make full disclosure on some of the essential terms of the refinancing loan, the evidence of the parties is in direct conflict. A through review of the trial evidence and documents, including the note containing the essential terms of the refinancing loan, demonstrates that PCI did not fail to make disclosure to the Myers regarding (a) the rate of interest, (b) the non-amortization (essentially "interest only") nature of the loan, or (c) the ten-year balloon payment. It is common knowledge that the rate of amortization of a mortgage loan is a variable function of factors regarding the rate of interest, term of years, and amount of monthly payment. Although a non-amortizing loan has the adverse consequence of the borrower still owing a large principal at the end of the term of the loan, it has the significant advantage of reducing the sum of the monthly payments, which appears to be the primary goal of the Myers in seeking refinancing. This matter of common knowledge probably was not known to the Myers because the evidence shows that they are wholly unsophisticated in matters of finance, and it could be said that there was a duty on the part of PCI as the Myers' fiduciary, at least regarding the balloon payment, to be as explicit as possible with them.[21] The evidence, nevertheless, does not demonstrate that PCI failed to make full disclosure to the Myers of these fundamental terms of the loan.

{¶ 37} The evidence is not in conflict, however, regarding the fact that PCI failed to disclose to the Myers the material facts on the transaction that it was engaged in dual representation without full disclosure, and that it was receiving a payment of $995 from the lender. Although the $995 payment from FCF to PCI is specified on the settlement statement, this after-the-fact method of "disclosure" does not meet PCI's duty of full disclosure.[22] Regardless whether

---

**21.** *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094 (further disclosure by fiduciary beyond mere written disclosure may be necessary); *Wyatt v. Union Mtge. Co.* (1979), 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45 ("a fiduciary's duty may extend beyond bare written disclosure of the terms of a transaction to duties of oral disclosure and counseling").

**22.** *Stone v. Davis;* supra, *Wyatt v. Union,* supra.

this payment was an out-and-out "kickback" or whether it was payment for services rendered by PCI to FCF, it constitutes a direct violation both of PCI's fiduciary duty of full disclosure and its fiduciary duty of good faith and loyalty.

{¶ 38} Although the Myers clearly suffered injury, for purposes of the law of "full disclosure" and "good faith and loyalty," it is immaterial whether the principal suffered injury or damage, since the primary reason for the rule is not to compensate the principal for loss but rather to prevent agents/fiduciaries from placing themselves in a position in which they are tempted to provide less than absolute good faith and loyalty. "[T]he rule does not depend upon whether * * * the principal is injured by the conduct of the agent. The wholesome rule is that the agent shall not put himself in a position where he may be tempted to betray his principal, or to serve himself at the expense of his principal." [23] "The rule * * * was intended not solely to remedy actual wrongs caused by such misconduct, but to discourage the occurrence of such misconduct altogether." [24] The underlying rationale for the rule is that it places the fiduciary in a conflict-of-interest that prevents it from acting "in accordance with the highest standard of integrity, with utmost good faith, and with scrupulous openness, fairness and honestly. * * * He cannot serve two masters." [25]

{¶ 39} As noted, PCI testified that it is common practice in the mortgage brokerage industry for a broker/fiduciary to receive two forms of payment from lenders. The first form of payment is called a "yield-spread premium," where the broker/agent has its borrower/principal agree to an interest rate higher than the rate at which the lender is willing to accept, and in return the broker receives a percentage of the difference from the lender:

{¶ 40} "PCI: Yield-spread premium is where you intentionally raise your customer's interest rates like if you qualify for a 9.9% and I give you or tell you qualify for a 9.9% and I give you or tell you qualify for a 10.35%, then they pay you 1% yield-spread.

{¶ 41} "THE COURT: Who pays you?

{¶ 42} "PCI: The bank because *they will make it up on the interest.*" (Emphasis added.)

{¶ 43} *Where, as in the case sub judice, a broker/agent fails to make advance full disclosure to the borrower/principal that he is paying a higher*

---

**23.** *Greenberg v. Meyer,* supra, at 384, 4 O.O.3d 353, 363 N.E.2d 779, citing *Pagel v. Creasy,* supra, at 206.

**24.** *Greenberg v. Meyer,* supra, at paragraph two of the syllabus.

**25.** 49 Ohio Jurisprudence 3d (1984) 66, 71, Fiduciaries, Section 13.

*interest rate to the lender than the broker could obtain for him on the loan, and in exchange for the higher rate the broker is receiving payment from the lender, the "yield-spread premium" is simply a fancy name for a kickback.*[26] Under federal law, yield-spread premiums are neither per se legal nor illegal; their legality depends upon whether they are actually earned in exchange for services and whether they are disclosed at the time of loan application and again at the time of closing.[27]

{¶ 44} The second form of payment is called a "servicing premium," which allegedly is received from the lender in return for the broker's performing certain services for the lender in connection with the loan. PCI attempts to justify its receipt of the $995 secret profit from the lender upon the basis that it is not a "yield point spread" but rather is a "servicing premium" for it performing certain services for the lender in connection with the loan. PCI testified that the $995

---

**26.** This decision was rendered on March 1, 2001. In November 2001, the Ohio legislature amended the Ohio Mortgage Brokers Act (R.C. 1322.01 et seq.) in Senate Bill 76, to become effective May 2, 2002. It continues to prohibit "conduct that constitutes improper, fraudulent, or dishonest dealings." R.C. 1322.07(C). Regarding full disclosure of payments from lenders to brokers, amended R.C. 1322.062(A)(7) specifies: "Within three business days after taking an application for a loan from buyer, a registrant shall deliver to the buyer a mortgage loan origination disclosure statement that contains * * * [a] statement that the lender may pay compensation to the registrant." Amended R.C. 1322.071(B)(2) specifies: "No mortgage broker, registrant, or licensee shall * * * receive, directly or indirectly, a premium on the fees charged for services performed by a bona fide third party," and a violation constitutes a felony of the fifth degree under R.C. 1322.99(A). Amended R.C. 1322.071(B)(3) specifies: "No mortgage broker, registrant, or licensee shall * * * pay or receive, directly or indirectly, a referral fee or kickback of any kind to or from a bona fide third party or other party with a related interest in the transaction, such as a home improvement builder, real estate developer, or real estate broker or agent, for the referral business," and a violation constitute a felony of the fourth degree under R.C. 1322.99(B). Additionally, under R.C. 1322.11(A)(3), "[t]he buyer may be awarded punitive damages" for a violation of R.C. 1322.071.

**27.** The mortgage industry may be positioning itself for an onslaught of class-action litigation as a result of the Eleventh Circuit Court of Appeals' affirming the United States District Court, Northern District of Alabama's decision in *Culpepper v. Irwin Mtge Corp.* (C.A.11,2001), 253 F.3d 1324, certifying a class in connection with a lawsuit seeking to declare yield-spread premiums unlawful under Section 8 of the Real Estate Settlement Procedures Act, where such premiums are paid to the broker's based solely on the broker's delivery of above par interest rate loans. In response to the decision in *Culpepper,* the Department of Housing and Urban Development issued a Statement of Policy effective October 18, 2001, that clarifies its 1999 Statement of Policy, reiterating HUD's position that yield-spread premiums are not per se legal or illegal and specifying the test for legality. HUD's clarification states that each transaction must be considered on a case-by-case basis, depending on whether the fees were earned or unearned. The test addresses (a) whether goods or facilities were actually performed for the compensation; and (b) whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. Real Estate Settlement Procedures Act Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers and Guidance Concerning Earned Fees under Section 8(b), Federal Register, Oct. 18, 2001, at 53032–53059. See, also, *Echevarria v. Chicago Title & Trust Co.* (C.A.7,2001), 256 F.3d 623.

payment was received for its services in providing "a complete loan package" to the lender, but also testified that it was not sure what the payment was for.

{¶ 45}   It makes no difference in law, however, whether the $995 payment was a "yield-spread premium" or a "servicing premium."   Regardless of the terminology used or the reason for the payment from the lender to the broker, without advance full disclosure such payment by definition constitutes both a breach of the fiduciary's duty of full disclosure and its duty of good faith and loyalty. Despite the fact such payment in form is made by the lender to the broker, in substance it ultimately comes to rest upon the principal.   PCI's representative admitted that "the lenders who pay yield-spread premiums and servicing points get their money back for that in the amount of interest that they charge by simply including that as part of their cost of doing business by which they set their rate."

{¶ 46}   For these reasons, the court finds that PCI breached both its fiduciary duty of full disclosure, and its fiduciary duty of good faith and loyalty to the Myers (a) by engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit.

## IV.   Violation of Mortgage Brokers Act Claim

{¶ 47}   The Ohio Mortgage Brokers Act (R.C. Chapter 1322) is designed in part to protect mortgage borrowers from wrongful conduct by mortgage brokers.

{¶ 48}   PCI is a "registrant" and the Myers are "buyers" under R.C. 1322.01.

{¶ 49}   R.C. 1322.07(C) provides that "[n]o registrant * * * shall do any of the following:   * * * [e]ngage in conduct that constitutes improper, fraudulent, or dishonest dealings."

{¶ 50}   R.C. 1322.11 provides that "[a] buyer injured by a violation of section * * * 1322.07 * * * may bring an action for recovery of damages.   * * * Damages * * * shall not be less than the amount paid by the buyer to the mortgage broker, plus reasonable attorney's fees and court costs.   * * *   The buyer may be awarded punitive damages."

{¶ 51}   The court finds that PCI by its actions engaged in "conduct that constitutes improper, fraudulent, and dishonest dealings" under the Ohio Mortgage Brokers Act (a) by engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit.

## V.   Breach of Contract Claim

{¶ 52}   The court finds that PCI by its actions breached its contract with the Myers (a) by engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit.

## VI.  Compensatory and Punitive Damages

{¶ 53}  The purpose of compensatory damages is to make the plaintiff whole.[28]  The evidence shows that the Myers' compensatory damages total $3,090, consisting of the $2,095 fee they paid directly to PCI and the $995 they paid indirectly to PCI through their mortgage payments.  The reasonable value of the Myers' attorney fees will be determined in a *Swanson* hearing.[29]

{¶ 54}  The modern history of punitive damages in Ohio begins with the classic case of *Saberton v. Greenwald* (1946), 146 Ohio St. 414, 32 O.O. 454, 66 N.E.2d 224, and culminates with the definitive case of *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174.  In *Saberton,* a jeweler sold a watch that he represented to be a new watch to a customer for $33.75.  The customer returned the watch to the jeweler for repairs five times before learning that it actually was a new case containing 25–year–old repaired watch works.  In awarding punitive damages, the Ohio Supreme Court relied upon the black-letter law of Ohio Jurisprudence: "[I]n *Ohio, in accord with the weight of authority, punitive damages are allowed as a punishment to the offender, and as an example, to deter others from offending in a like manner.  * * *  Such damages are given as smart money in the way of pecuniary punishment * * * upon the ground * * * public policy."* (Emphasis added.)  The court reversed the trial court that had refused to charge the jury on punitive damages, finding it to be reversible error not to so charge.  More than three decades later, the Ohio Supreme Court reaffirmed the "egregious fraud perpetuated by the defendant jeweler in *Saberton*" and declared that the case "serves as an example of the type of fraud for which punitive damages are awarded." [30]

{¶ 55}  The search in Ohio for the key ingredient to justify an award of punitive damages came to rest with the requirement of "actual malice" imposed by the Supreme Court of Ohio in *Preston v. Murty,* supra, in which the Ohio Supreme Court defined this essential element as follows: "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) *a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.*" (Emphasis added.)

{¶ 56}  The *Preston* court discussed punitive damages: "Since punitive damages are assessed for punishment and not compensation, a positive element of

---

28.  30 Ohio Jurisprudence 3d (1999) 15, Damages, Sections 8–10.

29.  *Swanson v. Swanson* (1976), 48 Ohio App.2d 85, 2 O.O.3d 65, 355 N.E.2d 894.

30.  *Logsdon v. Graham Ford Co.* (1978), 54 Ohio St.2d 336, 340, 8 O.O.3d 349, 376 N.E.2d 1333, fn. 2.

conscious wrongdoing is always required. This element has been termed conscious, deliberate or intentional. It requires a party to possess knowledge of the harm than might be caused by his behavior * * *." *The concept "requires a finding that the probability of harm occurring is great and that the harm will be substantial."* [31] (Emphasis added.)

{¶ 57}  By necessity, actual malice can be inferred from the conduct and surrounding circumstances. "[I]t is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances. One who has committed an act would scarcely admit that he was malicious about it, and so, necessarily, malice can be inferred from conduct." [32] It has also been declared by the Ohio Supreme Court that malice can be implied where the injury "follows as a natural and probable consequence" of the wrongful act. [33]

{¶ 58}  The Ohio Supreme Court, in a decision more recent than *Preston v. Murty*, defined what might be considered by some (in a "bad faith insurer" case) to be an "alternative" definition of malice—where an act of "bad faith" was also accompanied by a "dishonest purpose." [34] Although it does not appear that the court intended that the *Preston* definition of *malice* be replaced by this ("dishonest purpose") definition of *malice*, because the wrongdoer profited financially from the wrongful conduct in the instant case, the elements of both such definitions of *malice* are met.

{¶ 59}  *The Ohio Supreme Court specifies that the dual purposes of punitive damages include (a) punishment, and (b) deterrence of future similar conduct by the defendant and other persons.* "Punitive damages are awarded for the purpose of "punishing the tortfeasor and making him a public example so that others may be the deterred from similar conduct." *Motors Mut. v. Said*, supra. Punitive damage awards should serve the purpose of encouraging suit by a plaintiff as a "private attorney general" on issues of public importance. [35] This concept is especially significant in cases where apparently such as here the wrongful conduct is an industry-wide practice.

{¶ 60}  As aptly stated in a modern treatise on damages:

31.  *Preston v. Murty* (1987), 32 Ohio St.3d 334, 335–336, 512 N.E.2d 1174.

32.  *Davis v. Tunison* (1959), 168 Ohio St. 471, 475, 7 O.O.2d 296, 155 N.E.2d 904; *Joyce-Couch v. DeSilva* (1991), 77 Ohio App.3d 278, 288, 602 N.E.2d 286.

33.  *Smithhisler v. Dutter* (1952), 157 Ohio St. 454, 462, 47 O.O. 334, 105 N.E.2d 868.

34.  *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 698, 590 N.E.2d 1228.

35.  Dobbs, Remedies (1973) 206, Section 3.9.

{¶ 61}  "[I]t is generally recognized that punitive damages function both to punish the defendant and to deter others from engaging in similar conduct.  The proper amount, therefore, is that which is necessary to serve these purposes;  any greater amount is excessive.  'Punitive damages are properly denominated "smart money" and are designed to hurt in order to punish and deter, but they should not be so burdensome as to ruin the defendant.' " [36]

{¶ 62}  PCI showed a *"conscious disregard for the rights "* of its principals, the Myers, (a) by engaging in dual representation without advance full disclosure, and (b) by receiving a secret profit.  There was a "high foreseeability of harm," resulting from PCI's conscious disregard of the rights of the Myers.[37] *In this case, the probability that harm will occur is great, and the harm is substantial.*  These conclusions are evident from the facts that (1) the Myers are vulnerable because of their poverty-level economic status, (2) the possible loss of the Myers' personal residence places their peace of mind in grave jeopardy, (3) the Myers are defenseless because they are elderly, in ill health, have little education, and are hopelessly unsophisticated in financial affairs, and (4) the Myers' dire economic circumstances made it necessary for them to place their complete trust and confidence in their fiduciary/broker PCI.

{¶ 63}  *Saberton* is considered by the Ohio Supreme Court to be a classic example of the type of wrongful conduct that justifies punitive damages.  *Saberton* involves a luxury—a watch.  A different type of luxury, an automobile, was involved in *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464;  nevertheless, in the opinion of the Ohio Supreme Court it was the flagrant disregard for the rights of plaintiff that justified substantial punitive damages (600:1 ratio).  The facts of the instant case are much more egregious than the facts in *Saberton* or *Villella:*  they involve the possibly of loss of the personal residence of the Myers.  Additionally, there is no indication in those classic punitive damage cases that the plaintiff was vulnerable because he was poor, or in poor health, or had little education, or by financial necessity placed his complete trust in the fiduciary jeweler or auto dealer—significant factors present in the instant case.

{¶ 64}  For these reasons, the court specifically finds that PCI's actions demonstrate a conscious disregard for the rights of the Myers, the probability of harm occurring is great, and the harm is substantial, calling for an award of punitive damages to punish defendants and deter them and others from engaging in similar conduct.  The second prong of the "actual malice" test of *Preston v.*

---

36.  Kirchner & Wiseman, Punitive Damages:  Law and Practice (2d Ed.2000) (West Group), Section 18.08.

37.  *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 575 N.E.2d 416.

*Murty* is met; likewise, the above-noted "dishonest purpose" definition of malice is also met.

{¶ 65} The Myers carried their burden of proof for punitive damages, whether a "preponderance of the evidence" or a "clear and convincing" standard is applied.[38]

{¶ 66} The sole certainty in law regarding the proper sum of punitive damages is that no specific test or mathematical formula furnishes a definitive amount. The Supreme Court of the United States has rejected requests to formulate such a test or formula.[39] The factors to consider are varied and numerous. They include, among others, the relationship between the parties, the probability of recurrence unless the conduct is deterred, the harm that is likely to occur from similar conduct as well as the harm that actually occurred, the reprehensibility of the conduct, the nature of the wrong, the removal of any financial profit so that future conduct results in a loss, the financial status of the parties, the deterrence value, a reasonable relationship between compensatory and punitive damages, whether the wrong is a single occurrence or constitutes a pattern of wrongful conduct, and others. No one factor by itself is dispositive.[40]

{¶ 67} A recent Ohio case involves factors similar to those in the case at bar.[41] The plaintiff was *elderly* and *poor*, and the transaction involved her *personal residence*. Although the defendant caused the harm to the plaintiff in a fraudulent home repair transaction only *indirectly* by providing the funds for the repairs, the Ohio Supreme Court upheld a $1.5 million punitive damage award supported by a $15,000 compensatory damage award, a ratio of 100:1. A close reading of the case reveals that the facts that the plaintiff was elderly, and poor, and the transaction involved her personal residence, were significant in justifying such a substantial punitive damages award.

{¶ 68} The Supreme Court of the United States recently held that a $6,000,000 damage award supported by a $51,146 compensatory damage award (a ratio of 117:1) is not excessive.[42] [A] " 'reasonable relationship' " between the

---

**38.** *Johnson v. Stackhouse Oldsmobile, Inc.* (1971), 27 Ohio St.2d 140, 56 O.O.2d 78, 271 N.E.2d 782; *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464. See R.C. 2307.80, R.C. 2315.21, and *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062 (Ohio Tort Reform Act held unconstitutional in toto).

**39.** *TXO Prod. Corp. v. Alliance Resources Corp.* (1993), 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366.

**40.** Kirchner & Wiseman, Punitive Damages, supra, at Sections 18.05 and 18.08.

**41.** *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859.

**42.** *Browning–Ferris Industries of Vermont, Inc. v. Kelco* (1989), 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219.

compensatory and punitive damages involves much more than a simple mathematical comparison." [43]  In a case where the punitive damage award is likely to have a beneficial and farreaching effect on society because it is designed to deter wrongful conduct within an entire industry, it is appropriate to give great weight to this public purpose factor.[44]

{¶ 69}  In a recent case handed down by the Supreme Court of Ohio, an auto dealer refused to release an auto it had repaired to plaintiff's daughter until he paid an $800 auto repair bill.  He paid $250 toward the bill and filed suit for conversion.  The jury's award of $250 actual damages (plus $15,000 attorney fees) and punitive damages of $150,000 was upheld by Ohio Supreme Court "in light of appellant's behavior which exhibited a total disregard for the law and the rights of appellee."  The court found the 600:1 ratio not to be excessive.  In rendering its decision, the court stated: "[T]he amount of punitive damages to be awarded rests largely within the determination of the trier of fact."  *Villella v. Waikem Motors,* supra, at 40, 543 N.E.2d 464, citing *Saberton.*

{¶ 70}  An award of punitive damages is appropriate if it bears a rational relationship to the award of compensatory damages.  "[I]t is clear that an award of punitive damages is within the discretion of the finder of fact.  The award will not be overturned unless it bears no rational relationship or is grossly disproportionate to the award of compensatory damages." [45]

{¶ 71}  Ohio courts have followed United States Supreme Court decisions in declaring that in awarding punitive damages, "it is important not only to consider the actual harm caused but also the potential harm likely to be caused by defendant's conduct." [46]

## VII.  Damages for Breach of Contract

{¶ 72}  PCI breached its contract with the Myers (a) by engaging in dual representation without making advance full disclosure, and (b) receiving a secret profit.

---

**43.** *Zhadan v. Downtown L.A. Motors* (1976), 66 Cal.App.3d 481, 136 Cal.Rptr. 132.

**44.** *Drabik v. Stanley–Bostitch, Inc.* (W.D.Mo.1992), 796 F.Supp. 1271 (upholding $7.5 million punitive-damage award to carpenter who suffered brain damage when he bumped pneumatic nail gun held by co-worker, which had been sent to fire automatically on contact).

**45.** *Gollihue v. Consol. Rail Corp.* (1997), 120 Ohio App.3d 378, 402, 697 N.E.2d 1109, citing *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 531 N.E.2d 333;  and *Alessio v. Hamilton Auto Body, Inc.* (1985), 21 Ohio App.3d 247, 21 OBR 264, 486 N.E.2d 1224.

**46.** *Gollihue,* supra, at 403, 697 N.E.2d 1109, citing *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (upholding compensatory damage awards totaling $3.5 million and punitive damage awards totaling $8 million for two fatalities resulting from Conrail's negligent failure to properly guard and maintain railroad crossing).

{¶ 73} On these two breaches of contract, the court awards $3,090 in compensatory damages, plus statutory interest @ 10% per annum for the period between closing of the loan transaction and date of judgment ($1,687), for total compensatory damages including interest of $4,777.

## VIII. Damages for Breach of Fiduciary Duty

{¶ 74} PCI violated its fiduciary duty of full disclosure (a) by engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit. PCI violated its fiduciary duty of good faith and loyalty (a) by engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit.

{¶ 75} On these four violations of fiduciary duty, the court awards $4,777 in compensatory damages, and $33,439 in punitive damages (a ratio of 7:1).

## IX. Damages for Violation of Mortgage Brokers Act

{¶ 76} PCI engaged in conduct that constitutes "*improper* dealings, "*fraudulent* dealings," and "dishonest" dealings under R.C. 1322.07(C) by (a) engaging in dual representation without making advance full disclosure, and (b) by receiving a secret profit.[47]

{¶ 77} On these six violations of the Ohio Mortgage Brokers Act, the court awards $4,777 in compensatory damages, and $33,439 in punitive damages (a ratio of 7:1).

## X. Summary of Damages

{¶ 78} On the Myers' claim for breach of contract, the court awards $4,777 in compensatory damages, including interest. On the Myers' claim for breach of fiduciary duty, the court awards $4,777 in compensatory damages and $33,439 in punitive damages. On the Myers' claim for violation of the Ohio Mortgage Brokers Act, the court awards $4,777 in compensatory damages and $33,439 in punitive damages.

{¶ 79} Although compensatory damages of $4,777 is awarded on each of the Myers' three claims, because the purpose of compensatory damages is to make the plaintiff whole, total compensatory damages for all claims is limited to $4,777.

{¶ 80} Additional compensatory damages will be awarded in the sum of the Myers' reasonable and necessary attorney fees after a *Swanson* hearing.

---

47. See footnotes 26 and 27.

{¶ 81}   Because the purpose of punitive damages is (a) to punish the wrong-doer, and (2) to deter the wrongdoer and others from future similar misconduct, punitive damages of $33,439 is awarded on each of the Myers' two (2) tort claims, for total punitive damages of $66,878.

{¶ 82}   For the above-specified reasons, judgment is rendered in favor of plaintiffs and against defendants upon plaintiffs' claim for breach of fiduciary duty, violation of Ohio Mortgage Brokers Act, and breach of contract, in the total sum of $77,655 for compensatory and punitive damages.[48]

Judgment accordingly.

WILLIAM F. CHINNOCK, J., retired of the Cuyahoga County Juvenile Court, sitting by assignment.

---

48.   On August 16, 2001, the Seventh District Court of Appeals of Ohio (case No. 01–532–CA) dismissed the appeal in this case.