[Cite as *FV 1 Inc., v. Goodspeed*, 2012-Ohio-3001.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| FV 1 INC., | ) | |
| PLAINTIFF, | ) | CASE NO. 10 MA 170 |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| GERALD GOODSPEED, et al., | ) | |
| DEFENDANT/THIRD PARTY | ) | |
| PLAINTIFFS-APPELLANTS, | ) | |
| | ) | |
| - VS - | ) | |
| | ) | |
| KEYROCK FINANCIAL LTD., et al., | ) | |
| THIRD PARTY/ | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from Common Pleas
Court, Case No. 06 CV 234.

JUDGMENT:      Affirmed in part;
Reversed and Remanded in part.

APPEARANCES:
For Defendant/Third-Party
Plaintiffs-Appellants:      Attorney Cherie H. Howard
Northeast Ohio Legal Services
11 Central Square, Suite 800
Youngstown, OH 44503

For Third Party/
Defendants-Appellees:      Attorney William Jack Meola
Davis & Young, L.P.A.
Gibson-Governor Building
972 Youngstown-Kingsville Road
P.O. Box 740
Vienna, OH 44473

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

Dated:  June 20, 2012

DeGenaro, J.

{¶1}   Third-Party Plaintiffs-Appellants, Gerald and Suzanne Goodspeed, appeal the September 22, 2010 judgment of the Mahoning County Court of Common Pleas granting summary judgment in favor of Third-Party Defendants-Appellees, Keyrock Financial L.L.C., and Roy Root.  The Goodspeeds argue that summary judgment in favor of Keyrock and Root, who were mortgage brokers, was improper, because there remain genuine issues of material fact regarding their claims for breach of fiduciary duty, violations of the Ohio Mortgage Broker Act and civil conspiracy, arising out of a real estate transaction in which the Goodspeeds were the buyers and Third-Party Defendants Damon Petrich and Tammy Wayland-Petrich were the sellers.

{¶2}   The Goodspeeds' first and second assignments of error are meritorious in part, and their third assignment of error is meritless in its entirety. Summary judgment in favor of Keyrock and Root on the breach of fiduciary duty and OMBA claims based upon the yield spread premium issue was proper because that information was disclosed to the Goodspeeds, and this judgment is affirmed.  Further, summary judgment in favor of Keyrock and Root on the civil conspiracy claim was proper because there is no evidence they acted maliciously or formed an agreement to harm the Goodspeeds, and this judgment is affirmed.

{¶3}   However, there are genuine issues of material fact precluding summary judgment in favor of Keyrock and Root on the breach of fiduciary duty and OMBA claims based upon their alleged failure to perform certain functions required of a mortgage broker during the loan application process. There is evidence in the record that Keyrock and Root, instead of performing these functions, entrusted Petrich, the seller in the transaction, with procuring an appraisal of the subject property; obtaining almost all of the financial information from the Goodspeeds, their bank and landlord; and processing the loan documents.

{¶4}   Accordingly, the judgment of the trial court is affirmed in part, reversed in part and the cause remanded for trial on the Goodspeeds' claims against Keyrock and Root for breach of fiduciary duty and violation of the Ohio Mortgage Broker Act for their alleged failure to perform certain functions required of a mortgage broker during the loan

application process.

**Facts**

**{¶5}** During the spring of 2005, the Goodspeeds noticed a house for sale at 28 South Osborn Avenue in Youngstown. At that time, the property, a 944 square foot, two-bedroom, one-bath, frame home built in 1920, was undergoing renovations. The Goodspeeds expressed interest in the property to Damon Petrich, husband of property owner, Tammy Wayland-Petrich. Damon Petrich asserted his authority to negotiate the sale of the property on behalf of his wife.

**{¶6}** Petrich took the Goodspeeds on a tour of the house. The Goodspeeds noticed a number of obvious defects on the premises including deteriorated wooden porch pillars; dilapidated gutters and down spouts, a leaking roof, a sinking foundation, damaged ceilings, uneven and slanted flooring, a damaged bathtub and toilet, a hole in a closet floor, no heat in the rear bedroom, inoperable electrical outlets, a basement door that needed replacing, and collapsing basement walls.

**{¶7}** Petrich offered to completely renovate the property and to sell it to the Goodspeeds for $63,000. In addition, Petrich promised that the Goodspeeds would not be required to provide any out-of-pocket money for the purchase, and that he would help them find financing.

**{¶8}** Petrich was familiar with the real estate business, having worked as an apprentice appraiser in the past. Through this work he met Root, a loan officer for Keyrock, a mortgage brokerage. A mortgage broker assists a buyer with finding a lender who will finance the purchase of a residence, and oversees the processing and execution of all documents necessary to take a home loan from application to closing. Pertinent to this appeal, through the loan application process the mortgage broker is to procure an appraisal of the subject property, and also obtain financial information *directly* from the buyers, their bank and their landlord. The mortgage broker is to ensure that this information is then *directly* sent to the lender. Keyrock, through Root, was able to obtain financing for the Goodspeeds from New Century Mortgage Corporation.

{¶9} According to a letter of recommendation written by Root in support of Petrich's attempt to obtain a full real estate appraisal license, Petrich had performed over 300 appraisals for Root-affiliated companies. Since Petrich was only ever an apprentice appraiser, a fully licensed appraiser always had to "sign off" on Petrich's appraisals. Eventually Root had to stop using Petrich for appraisals because some lenders would no longer approve appraisals from Petrich. Petrich testified that he was never permitted to sit for the state real estate appraiser exam due to dishonest conduct. Further, Petrich admitted he been sued by several homeowners for performing allegedly inflated appraisals, but stated those suits had settled out of court. Root claimed he never asked Petrich about the status of his license and never inquired as to why Petrich was on the "unapproved" appraiser list for several lenders. Root and Petrich also had a social relationship.

{¶10} After the Goodspeeds expressed serious interest in the property, Petrich contacted Root to assist the Goodspeeds in obtaining financing for the purchase.

{¶11} On May 3, 2005, Mr. Goodspeed executed a purchase agreement, drafted by Petrich. Mr. Goodspeed did not read the contract before signing it. It turned out that the contract contained a purchase price of $70,000 and did not include any promises on the part of Petrich to renovate the property. To the contrary, the purchase agreement stated that the purchaser agreed to buy the property in "as is" condition.

{¶12} On May 11, 2005, Mr. Goodspeed met with Petrich, not Root, to execute various documents that established his relationship as a client of Keyrock, including a Mortgage Loan Origination Disclosure Statement and a Broker Retention Agreement. That same date, Mr. Goodspeed executed a Uniform Residential Loan Application and either executed or received related loan documents including a Good Faith Estimate which contained a purchase price for the property of $70,000 and a request for loan amount of $59,500. These documents included information about Appellees' fees, including broker fees and a yield spread premium.

{¶13} Throughout the loan application process, the Goodspeeds *never* met with

Root. Instead, Root would fax necessary documents to Petrich, who then had the Goodspeeds complete them. Then Petrich would fax or send the documents back to Root or directly to the lender, as applicable. Petrich always acted as an intermediary between the Goodspeeds and Root. Root never even spoke to the Goodspeeds about the loan during the application process. Root testified that Mr. Goodspeeds' loan was considered a subprime loan. At the time of his loan application, Mr. Goodspeed had a FICO credit score of 549.

{¶14} In early June 2005, the amount requested in the loan was changed and Mr. Goodspeed executed a second set of loan application documents. Mr. Goodspeed did not read most of these documents before signing them. These documents also included information about Appellees' fees, including broker fees and a yield spread premium.

{¶15} One of the underwriting requirements for the loan was that the buyers have a bank account and contribute at least $1000 toward the down payment. A Request for Verification of Deposit form is used in furtherance of this requirement. This federally promulgated form contained instructions that it should be sent by the mortgage broker directly to the borrower's bank for completion. Once the bank completed the form, it was then to be sent directly to the lender. Root did not follow these instructions; instead he forwarded the form to Petrich to ensure its completion. Root testified it was fair to say he initialed the Request for Verification of Deposit form and faxed it to Petrich in blank.

{¶16} The Goodspeeds did not have any savings prior to applying for the loan. According to Mrs. Goodspeed, on June 7, 2005, Petrich accompanied her to National City Bank in Boardman, where she opened an account with $50. Immediately thereafter, bank records show that $3500 was deposited into the account, and then withdrawn and a check issued to Foundation Title, the closing agent for the transaction, for that same amount. Although Petrich did not admit he provided the $3500 for this purpose, his own National City Bank records show a withdrawal of $3500 from his personal account on that same day. Like the other pertinent loan documents, Root had faxed the Request for Verification of Deposit form to Petrich who had it completed and then faxed it back to

Root. This action was contrary to the express instruction on the form admonishing that it not be transmitted through the applicant or any other party.

{¶17} Regarding the source of the $3500 that flowed through the savings account set up by the Goodspeeds two days before the closing, the record reveals that, as part of the sale of the property, Petrich and his wife became holders of a second mortgage in the amount of $3500. Mr. Goodspeed stated it was his understanding that this second mortgage was to cover the good-faith money that Petrich had provided for the transaction. Notably, there is no evidence that Keyrock and Root were aware of this occurrence at the bank.

{¶18} A Verification of Rent form was also required as part of the loan application process. This form contained the borrower's landlord and rental history and confirmed that the borrower had a history of paying rent in a timely fashion, an underwriting requirement. As the mortgage broker, Root was to send this form to the Goodspeeds' landlord. The instructions on this form required that it be transmitted directly from the landlord to the lender and not through the applicant or any other party. Root entrusted Petrich with processing this form, rather than processing it himself. After the foreclosure was filed, the Goodspeeds discovered false information listed on the form, specifically the name of a landlord that the Goodspeeds never rented from; Eldridge Hilton Realty & Management. Mr. Goodspeed averred that he did not complete that part of the form and that he provided Petrich with accurate rental history information, which did not include Eldridge Hilton Realty & Management. Petrich claimed during depositions that he had never heard of Eldridge, and maintained this position even when confronted with a letter written by Eldridge president Jason Scarnecchia in support of Petrich's application to become a real estate appraiser. Root testified he did not complete the landlord information, but rather sent the form either to Petrich or Eldridge directly.

{¶19} Finally, a property appraisal was required as part of the underwriting process. The Broker Retention form states that one of Keyrock's responsibilities included arranging the appraisal. Root testified that Petrich told him he had the property appraised

already and that he would take care of that. Root conceded that it was unusual for a seller to take responsibility for obtaining an appraisal. According to Petrich, Tim Corey of Corey Appraisal Services performed the appraisal and this was forwarded on to the lender, New Century. Root testified that he never saw the actual appraisal and that ultimately it is the lender's responsibility to approve or deny it. Root admitted he "should have" seen the appraisal but did not recall ever seeing one for this particular transaction.

{¶20} The actual appraisal is not part of the record. Although the Goodspeeds had the right to request a copy of the appraisal at the time, they did not do so. Mr. Goodspeed testified that Petrich told him he had appraised the property himself. Appellees did not retain a copy of appraisal, and the original lender, New Century, went bankrupt. We can glean from the record that the appraisal must have valued the property for at least $63,000, the amount of the loan.

{¶21} The Goodspeeds point to county auditor records to suggest that the appraisal was grossly inflated. The transfer history of the property indicates that Mr. Petrich purchased the property in 1996 for $17,000.00, and that on July 5, 2001, the property was transferred to Mrs. Petrich for $22,100.00. The Goodspeeds did not check these records prior to closing. On October 17, 2005, just months after the sale to the Goodspeeds, the Mahoning County Auditor appraised the property at $37,700.00.

{¶22} The closing took place on June 9, 2005, at Mrs. Goodspeed's place of employment. Mr. Goodspeed testified that he did not read most of the documents before signing them. After the Goodspeeds took possession of the property, Petrich never completed the repairs as he had promised. The Goodspeeds discovered other serious defects in the house. One contractor estimated that it would cost over $40,000 to complete the renovations as envisioned. New Century was the original lender and mortgage holder, which subsequently transferred its interest to FV1, Inc.

## Procedural History

**{¶23}** The instant lawsuit originated as a foreclosure action by FV1, Inc. against the Goodspeeds in mid-2006. The Goodspeeds filed an answer along with a third-party complaint against Keyrock and Root for breach of fiduciary duty, violations of the OMBA, and civil conspiracy, which Appellees answered. The third-party complaint also alleged claims against New Century, Damon and Tami Petrich, which are not at issue in this appeal.

**{¶24}** The entire case was stayed July 18, 2007 when New Century filed for bankruptcy. The case was reactivated on February 9, 2009, and subsequently, the Goodspeeds dismissed all claims against New Century with prejudice. By agreement of the parties, the foreclosure complaint and the Goodspeeds' counterclaim against FV1 were dismissed with prejudice on October 21, 2010.

**{¶25}** After the completion of discovery, Keyrock and Root filed a motion for summary judgment as to all claims, which the Goodspeeds opposed; and the magistrate issued a decision sustaining the motion. The Goodspeeds filed timely objections which were overruled; and the trial court adopted the magistrate's decision granting summary judgment in favor of Keyrock and Root on September 22, 2010.

**{¶26}** The Petrichs filed a separate motion for summary judgment against the Goodspeeds which the magistrate overruled in its entirety on October 6, 2010. There are no objections to that decision in the record, and to date, the trial court has not ruled on the magistrate's decision. Thus, the Goodspeeds' claims against the Petrichs remain pending in the trial court.

**{¶27}** Because the September 22, 2010 judgment contained the Civ.R. 54(B) "no just cause for delay" language, it is a final, appealable order even though claims against the Petrichs remain pending in the trial court.

## Standard of Review

**{¶28}** Each of the Goodspeeds' assignments of error deal with the trial court's decision to grant summary judgment to Keyrock and Root. When reviewing a trial court's

decision to grant summary judgment, an appellate court applies the same standard used by the trial court and, therefore, engages in de novo review. *Parenti v. Goodyear Tire & Rubber Co.*, 66 Ohio App.3d 826, 829, 586 N.E.2d 1121 (9th Dist.1990). Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the nonmovant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000). A fact is material when it affects the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999).

{¶29} When moving for summary judgment, a party must produce some facts that suggest a reasonable fact-finder could rule in her favor. *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997). "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). The trial court's decision must be based upon "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action." *Id.*, citing Civ.R. 56(C). The nonmoving party has the reciprocal burden of specificity and cannot rest on the mere allegations or denials in the pleadings. *Id.* at 293.

### Breach of Fiduciary Duty

{¶30} In their first of three assignments of error, Appellants assert:

{¶31} "The trial court erred in granting Appellees' motion for summary judgment because genuine issues of material fact remained in dispute as to whether they violated their fiduciary duty of full disclosure and good faith and loyalty to Appellants."

{¶32} " 'The elements for a breach of fiduciary duty claim are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an

injury resulting proximately therefrom." '(Citations omitted.)" *Camp St. Mary's Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, 889 N.E.2d 1066, ¶19 (3d Dist.), quoting *Thomas v. Fletcher*, 3d Dist. No. 17-05-31, 2006-Ohio-6685, ¶13, quoting *Werthmann v. DONet*, 2d Dist. No. 20814, 2005-Ohio-3185, ¶42. *See also Strock v. Pressnell,* 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1998). Thus, a claim for breach of fiduciary duty is similar to an ordinary negligence claim, the difference being that the standard of care is higher. *Camp St. Mary's* at ¶19.

{¶33} Keyrock and Root did owe a fiduciary duty to the Goodspeeds. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 66 Ohio St.2d 74, 419 N.E.2d 1094 (1981), quoting, *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974).

{¶34} "A mortgage broker has a fiduciary duty to his or her client. 'The liabilities of a broker to his [principal] are those of an agent. The relation of principal and agent is always regarded by the court as a fiduciary one, implying trust and confidence' " *Swayne v. Beebles,* 176 Ohio App.3d 293, 891 N.E.2d 1216 (10th Dist.2008), quoting *Myer v. Preferred Credit, Inc.*, 117 Ohio Misc.2d 8, 2001-Ohio-4190, 766 N.E.2d 612, ¶19 (C.P), quoting 10 Ohio Jurisprudence, Brokers, Section 116, at 96 (1995). The duties owed by fiduciaries to their principals are "the basic obligations of agency: loyalty and obedience." *Guth v. Allied Home Mtg. Capital Corp.*, 12th Dist. No. CA2007-02-029, 2008-Ohio-3386, ¶63, quoting Restatement of the Law 2d, Agency, Section 14N.

{¶35} The Mortgage Loan Origination Disclosure Statement, signed by Mr. Goodspeed and Root, sets forth contractual duties Keyrock and Root owed to the Goodspeeds. Specifically it states that the broker:

> for the purposes of assisting * * * the applicant in obtaining the mortgage
> loan will provide the following brokerage services: * * * [1] collecting

financial information, (2) processing the loan file, [3] reviewing credit history, [4] preparing the file for submission, [5] verifying financial information, [6] submitting files for lender approval, [6] assessing lender availability, and [7] counseling [the borrower] about [his or her] application."

**{¶36}** In addition, the Broker Retention Agreement, also signed by Mr. Goodspeed and Root, indicated that the broker's responsibilities included "[a]rrang[ing] for appraisal of the home, title work and survey," and "[c]ommunication with Borrower and Lender throughout the approval process."

**{¶37}** In their third-party complaint and the summary judgment proceedings, the Goodspeeds alleged that Keyrock and Root breached their fiduciary duties to them in two ways. First, by failing to properly disclose their relationship with New Century and the existence of a yield spread premium, a tool which allowed Keyrock and Root to profit by increasing the interest rate on the Goodspeeds' loan. Second, that Keyrock and Root "overall fail[ed] to act as the Goodspeeds' fiduciary agent to protect them from the self-serving inclinations of Damon Petrich." Specifically, that Keyrock and Root breached their fiduciary duty by improperly delegating to Petrich the responsibility of furnishing the Goodspeeds' financial documents, and selecting an appraiser.

**{¶38}** Regarding the yield spread premium issue, the Sixth District explained, "[a] yield-spread premium occurs when a broker causes a borrower to accept an interest rate higher than the rate a lender is willing to offer. In return, the broker receives a payment from the lender (usually a percentage of the difference), sometimes without the knowledge or consent of the borrower." *Residential Funding Co., L.L.C. v. Thorne*, 6th Dist. No. L-09-1324, 2010-Ohio-4271, ¶50.

**{¶39}** However, the yield spread premium here *was* disclosed to the Goodspeeds both before and during the closing. The Broker Retention Agreements, signed by Mr. Goodspeed on May 11, 2005, and June 3, 2005, both stated: "In addition to the Broker Fee paid to the Broker by the applicant, Broker may also receive certain amounts from the Lender, such as servicing release or yield spread premiums based on the difference

between the Lender's wholesale rate and the retail note rate paid by the Applicant on the loan." The Mortgage Loan Origination Disclosure Statements dated May 11, 2005 and June 3, 2005 both identified a specified sum that Keyrock and Root were to receive from the loan proceeds for their services. The documents go on to state: "We may also receive additional compensation from the lender or investor of the loan." The Good Faith Estimates dated May 11, 2005 and June 3, 2005 also specifically reference the amount of the yield spread premium that would be paid to the broker. Mr. Goodspeed failed to read any of these documents before signing them.

**{¶40}** In addition, the HUD-1 Settlement Statement, which was part of the packet of documents signed at closing on June 9, 2005, included the yield spread premium, which Mr. Goodspeed also failed to read prior to signing it. The Closing Instructions, which Mr. Goodspeed also signed at closing, specified a mortgage broker fee of $661.00 paid to Keyrock, and a yield spread premium of $945.00. Specifically the Closing Instructions provided: "add yield premium to Broker (Paid by Lender) (1.500%)." Mr. Goodspeed testified that he did not know whether these fees were unreasonable or excessive.

**{¶41}** Based on all of the above, the Goodspeeds were adequately informed about the yield spread premium from the beginning of the transaction. This case is factually distinguishable from *Myer*, *supra*, cited by the Goodspeeds. In *Myer*, 117 Ohio Misc.2d 8, 2001-Ohio-4190 766 N.E.2d 612, there was no advance disclosure of the yield spread premium; the interest rate for the Myer's loan was increased from 11.6% to 13.35% immediately before closing, with no explanation as to the reason for the increase. *Id.* at ¶5, 35, 45.

**{¶42}** *Lashua v. Lakeside Title & Escrow Agency*, 5th Dist. No. 2004CA00237, 2005-Ohio-1728, is also factually distinguishable. There the settlement statement did not explicitly mention a yield spread premium, instead designating the money the broker would receive from the lender as "P.O.C," which the court found was "cryptic" and did not put the buyers on notice of the payment. Further there was evidence that the loan

origination disclosure statement was never provided to the buyers. *Lashua* at ¶38-39. By contrast, the settlement statement here designated the $945 fee as a yield spread premium, and other documents signed by Mr. Goodspeed prior to closing reference and explain the yield spread premium.

**{¶43}** In sum, there is no genuine issue of material fact regarding this branch of the Goodspeeds' breach of fiduciary duty claim. Summary judgment in favor of Keyrock and Root was proper as it relates to the yield spread premium issue.

**{¶44}** However, turning to the second issue, there is a genuine issue of material fact as to whether Keyrock and Root breached their fiduciary duty to the Goodspeeds by delegating so many responsibilities to Petrich, including processing the various financial documents, loan applications and the appraisal. Although there is no evidence that Keyrock and Root had actual knowledge that the appraisal was inflated or the loan documents falsified, reasonable minds could differ as to whether they *should have known.*

**{¶45}** Turning first to the loan documents, Root entrusted Petrich to ensure the completion of several key forms, despite express instructions on those forms that the mortgage broker was to send them directly to the designated recipient. The Verification of Rent form provided that the applicant's landlord complete information about the applicant's rental history and that "[t]he form is to be transmitted directly to the lender and is not to be transmitted through the applicant or any other party." Similarly, the Verification of Deposit form provided that the depository bank complete information about the applicant's account; again this form admonished that "[t]he form is to be transmitted directly to the lender and is not to be transmitted through the applicant or any other party." Despite these instructions, Root permitted Petrich to act as an intermediary between the Goodspeeds and the lender with regard to completing these forms.

**{¶46}** Compounding these errors is the fact that Root knew that Petrich was the seller in the transaction, and therefore not a disinterested party. This creates a genuine issue of material fact as to whether Root's use of Petrich as an intermediary between

Keyrock and the Goodspeeds to ensure the completion of nearly all the financial documents required for the loan, most notably the Verification of Rent and Deposit forms, constitutes a breach of fiduciary duty.

**{¶47}** Regarding the appraisal, Root admitted it was "unusual" for the seller to procure an appraisal. Moreover, the Broker Retention Agreement listed "arrangement of the appraisal" as Keyrock's responsibility. Further, Root knew that Petrich had a personal stake in the transaction as the seller as well as a questionable history as an apprentice appraiser. Also, the fact that Petrich was sued by several Mahoning County homeowners for allegedly providing inflated appraisals, and was later disqualified to sit for the state real estate appraisal exam due to dishonest conduct are matters of public record. Root claims to have no knowledge of these problems, yet admitted to having both a business and personal relationship with Petrich, and, in fact, wrote Petrich a letter of recommendation to the Ohio real estate appraisal board. Taken together, these facts also create a genuine issue of material fact as to whether Root's decision to rely on Petrich to obtain the appraisal constitutes a breach of fiduciary duty.

**{¶48}** Construing the evidence in favor of the Goodspeeds, there remain genuine issues of material fact regarding whether Root should have known that entrusting Petrich with the responsibility for obtaining the Goodspeeds' application and other financial documents, along with the appraisal, could cause financial harm to the Goodspeeds. Accordingly, the Goodspeeds' first assignment of error is meritorious in part. The trial court's summary judgment in favor of Keyrock and Root on the Goodspeeds' claim of breach of fiduciary duty on the yield spread premium issue is affirmed. The trial court's summary judgment in favor of Keyrock and Root on the Godspeeds' claim of breach of fiduciary duty for the failure to perform certain functions required of a mortgage broker during the loan application process is reversed and the cause remanded for trial on that claim.

### Mortgage Broker Act

**{¶49}** In their second assignment of error, Appellants assert:

{¶50} "The trial court erred in granting Appellees' motion for summary judgment because genuine issues of material fact remained in dispute as to whether they violated the Mortgage Brokers Act."

{¶51} The Ohio Mortgage Broker Act, R.C. Chapter 1322, "is designed in part to protect mortgage borrowers from wrongful conduct by mortgage brokers." *Equicredit Corp. of America v. Jackson*, 7th Dist. No. 03 MA 191, 2004-Ohio-6376, ¶65. The Act prohibits mortgage brokers from, inter alia:

> (B) Mak[ing] false or misleading statements of a material fact, omissions of statements required by state law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations;
>
> (C) Engag[ing] in conduct that constitutes improper, fraudulent, or dishonest dealings; * * *
>
> (E) Knowingly mak[ing], propos[ing], or solicit[ing] fraudulent, false, or misleading statements on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document. For purposes of this division, "fraudulent, false, or misleading statements" does not include mathematical errors, inadvertent transposition of numbers, typographical errors, or any other bona fide error. R.C. 1322.07(B), (C) and (E).

{¶52} The Goodspeeds argue that the trial court erred by granting summary judgment on its OMBA claims. It is undisputed that Keyrock and Root were considered mortgage brokers pursuant to the OMBA when they assisted the Goodspeeds in obtaining financing to purchase the property. See R.C. 1322.07(G)(1) and (2) (now codified as R.C. 1322.07(G)(1)(a) and (b)):

> As used in sections 1322.01 to 1322.12 of the Revised Code: * * *

(G) "Mortgage broker" means any of the following:

(1) A person that holds that person out as being able to assist a buyer in obtaining a mortgage and charges or receives from either the buyer or lender money or other valuable consideration readily convertible into money for providing this assistance;

(2) A person that solicits financial and mortgage information from the public, provides that information to a mortgage broker, and charges or receives from the mortgage broker money or other valuable consideration readily convertible into money for providing the information[.] * * *

{¶53} The Goodspeeds assert they have provided evidence that Keyrock and Root violated the OMBA in three ways: by realizing undisclosed profits by virtue of the yield spread premium; by improperly executing and handling the financing documents; and by permitting an improper appraisal.

{¶54} First, the yield spread premium issue has been discussed in the context of the first assignment of error. A yield spread premium is not a per se violation of the OMBA, but could be a violation if not properly disclosed to the buyer. *See Lashua,* 2005-Ohio-1728, at ¶39; *Myer* 117 Ohio Misc.2d 8, 2001-Ohio-4190, 766 N.E.2d 612, at ¶45, 51. Because the yield spread premium here was adequately disclosed in the Broker Retention Agreement, Mortgage Loan Origination Disclosure Statement, Good Faith Estimate, and the HUD Settlement Statement, there was no violation of the OMBA, and summary judgment on this claim was proper.

{¶55} Second, the Goodspeeds claim that Keyrock and Root improperly processed the financing documents, some of which contained incorrect financial and other data about the Goodspeeds essential to the underwriting of the loan. Keyrock and Root correctly counter that the Goodspeeds presented no evidence that they had any knowledge that there was incorrect information in those documents; thus, there could be no liability. R.C. 1322.07(E), as it read in 2005, prohibited mortgage brokers from "*knowingly* mak[ing], propos[ing], or solicit[ing] fraudulent, false, or misleading statements

on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document. * * *." (Emphasis added.)[1]  Further, there is no evidence that Root and Keyrock engaged in a "continued course of misrepresentations" as prohibited by R.C. 1322.07(B).

{¶56} However, R.C. 1322.07(C) prohibits "improper" conduct by a mortgage broker, although the word improper is not defined by the statute.  Accordingly, "undefined terms are to be accorded their common, everyday meaning." *MP Star Financial, Inc. v. Cleveland State Univ.*, 107 Ohio St.3d 176, 2005-Ohio-6183, 837 N.E.2d 758, ¶8, citing *State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983); R.C. 1.42.  The Merriam Webster Online Dictionary defines "improper" as "not in accord with fact, truth, or right procedure." http://www.merriam-webster.com/dictionary/improper.

{¶57} Based on our conclusion in the first assignment of error that genuine issues of material fact remain regarding whether Keyrock and Root breached their fiduciary duties to the Goodspeeds because they permitted the loan documents to be processed by the seller, there is also a genuine issue of material fact as to whether entrusting the completion of the loan documents to the seller was "improper" conduct in violation of R.C. 1322.07(C).  Conduct that breaches a fiduciary duty is improper.

{¶58} Turning to the appraisal issue, like the yield spread premium issue, the appraisal has also been discussed in the context of the first assignment of error above. Keyrock and Root's conduct did not violate section (E), because there is no evidence that they *knowingly* submitted a false or inflated appraisal in violation of that subsection. R.C. 1322.07(E).  Root testified that he never saw the appraisal; and further that it was up to the lender to approve or deny it.  In addition, the actual appraisal is not part of the record which creates a proof problem.

{¶59} However, the fact that Keyrock and Root entrusted the selection of the

---

[1] The current version of R.C. 1322.07(E) is substantially similar, prohibiting mortgage brokers from: "[k]nowingly mak[ing], propos[ing], or solicit[ing] fraudulent, false, or misleading statements on any mortgage loan document or on any document related to a mortgage loan, including a mortgage application, real estate appraisal, or real estate settlement or closing document. * * *"

appraiser to Petrich, the seller, constitutes "improper" conduct under the OMBA.  R.C. 1322.07(C).  As explained in the first assignment of error, there is a genuine issue of material fact as to whether this constitutes a breach of fiduciary duty.  As a corollary, there is also a genuine issue of material fact as to whether this also constitutes "improper" conduct by a mortgage broker under the OMBA.

{¶60}  Construing the evidence in favor of the Goodspeeds, there remain genuine issues of material fact regarding whether Keyrock and Roots' entrustment of the appraisal and the loan documents to Petrich, who was the seller in the transaction, was improper conduct.  Accordingly, the Goodspeeds' second assignment of error is meritorious in part.  The trial court's summary judgment in favor of Keyrock and Root on the Goodspeeds' claim of a violation of the OMBA regarding the yield spread premium is affirmed.  The trial court's summary judgment in favor of Keyrock and Root on the Godspeeds' claim of a violation of the OMBA for entrusting obtaining the appraisal and processing the loan documents to Petrich is reversed and the cause remanded for trial on that claim.

## Civil Conspiracy

{¶61}  In their third and final assignment of error, the Goodspeeds assert:

{¶62}  "The trial court erred in granting Appellees' motion for summary judgment because genuine issues of material facts remained in dispute as to whether they engaged in a civil conspiracy."

{¶63}  "A civil conspiracy is 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'  *Equicredit*, quoting *LeFort v. Century 21-Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640.  "An underlying unlawful act is required before a civil conspiracy claim can succeed."  *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464. "The malice involved in the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.' "  *Id.*, quoting *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 166 N.E.2d 227.  "Civil conspiracy is considered an intentional tort."  *Equicredit* 2004-Ohio-6376, at ¶74, quoting *USX Corp. v.*

*Penn Cent. Corp.*, 137 Ohio App.3d 19, 26, 738 N.E.2d 13 (8th Dist.2000).

{¶64} The Goodspeeds assert that Keyrock, Root and the Petrichs unlawfully and maliciously conspired to conceal information from the Goodspeeds which they were under a duty to disclose; induce Mr. Goodspeed to enter into the purchase contract and loan contracts to obtain profits for themselves while injuring the Goodspeeds; make false statements in connection with the loan; commit mail fraud by knowingly causing a fraudulent loan document to be sent, delivered or moved; commit various violations of Ohio federal and criminal statutes involving real estate transactions, mortgage loans and consumer protection; and misrepresent the terms of the real property purchase.

{¶65} Although there is some evidence that the Petrichs may have committed some of these acts, and in fact the magistrate *separately* found that the conspiracy claims as they relate to the Petrichs *alone* should survive summary judgment, there is no evidence that *Keyrock and Root* took part in any conspiracy.

{¶66} The Goodspeeds assert that this court should infer a conspiracy existed between Keyrock, Root and Petrich because they "knew or should have known there were serious questions in [Petrich's] background regarding appraisals and loan packaging," including that Petrich, while an apprentice appraiser, was on the "disapproved" list for several lenders, and that Petrich was denied the privilege of sitting for the state real estate appraisal boards due to a history of dishonesty. According to the Goodspeeds, because Keyrock and Root continued to deal with Petrich despite actual or constructive knowledge of his checkered history, this demonstrates the existence of a conspiracy.

{¶67} However, the civil conspiracy claim as it relates to Keyrock and Root is largely based upon suppositions, not actual evidence. While there is evidence that Petrich and Root were long-time acquaintances, and, as mentioned, there is some evidence of unlawful acts by Petrich, there is no evidence that Keyrock and Root conspired with Petrich to harm the Goodspeeds. The evidence in the record of Keyrock and Root's conduct, specifically their entrustment of the appraisal process and

processing the relevant loan documents to Petrich, could be considered negligent or a breach of fiduciary duty, as discussed in the context of the first assignment of error. However, there is neither evidence of malice on the part of Keyrock and Root, nor evidence that they had knowledge of Petrich's alleged fraudulent acts with regard to the loan documents and the appraisal. Similarly, there is no evidence that Keyrock and Root formed an agreement or understanding with the Petrichs to harm the Goodspeeds.

{¶68} In fact, when questioned at his deposition, Mr. Goodspeed conceded that he had no evidence that Keyrock and Root acted maliciously towards him with respect to the transaction, acted in concert with anyone to deprive him of anything. Nor did Mr. Goodspeed believe that Keyrock and Root knowingly took advantage of him.

{¶69} This case is distinguishable from *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998), cited by the Goodspeeds. In *Williams,* the plaintiff, an elderly, low-income homeowner alleged, inter alia, that Blair, a home improvement "pitchman," conspired with Aetna, a lender, to defraud her and others similarly situated by convincing her to take out a series of high-interest, low-risk loans for home improvement work that Blair never intended to have fully performed. Williams claimed that Aetna benefitted by making these loans when it knew that the work contracted for by Blair would never be done. The Ohio Supreme Court upheld the jury verdict in favor of Williams on her civil conspiracy claim, concluding it was supported by ample evidence, specifically: testimony from Aetna's former managers that Blair's financial problems were well known among Aetna's employees for a significant time before the loan was made to Williams; that the term "Blair loan" had developed a specific, highly negative connotation among employees; and that there was a close relationship between Aetna employees and Blair. *Williams* at 476.

{¶70} By contrast, here there is simply no evidence in this record that Keyrock and Root knew about Petrich's alleged scheme against the Goodspeeds. This case is similar to *Equicredit*, 2004-Ohio-6376, at ¶77, where this court concluded there was no evidence of a conspiracy because the mortgage broker was a separate company from

the home improvement company that assisted the buyers in obtaining the loan, and the mortgage broker did not know about false information in the loan application.

{¶71}  The Goodspeeds cite several federal district court cases to support their position regarding the existence of a conspiracy, however, those cases are unhelpful as they arose in the context of motions to dismiss, not motions for summary judgment. *Matthews v. New Century Mortg. Corp.*, 185 F.Supp.2d 874 (S.D.Ohio 2002); *Eva v. Midwest Natl. Mortgage Banc, Inc.*, 143 F.Supp.2d 862 (N.D.Ohio, 2001).

{¶72}  The Goodspeeds did not meet their reciprocal *Dresher* burden to put forth evidence of a conspiracy.  Accordingly, the Goodspeeds' third assignment of error is meritless, and the trial court's summary judgment in favor of Keyrock and Root on the Goodspeeds' civil conspiracy claim is affirmed.

### Conclusion

{¶73}  The Goodspeeds' first and second assignments of error are meritorious in part, and their third assignment of error is meritless in its entirety. Summary judgment in favor of Keyrock and Root on the breach of fiduciary duty and OMBA claims based upon the yield spread premium issue was proper because that information was disclosed to the Goodspeeds, and this judgment is affirmed.  Further, summary judgment in favor of Keyrock and Root on the civil conspiracy claim was proper because there is no evidence they acted maliciously or formed an agreement to harm the Goodspeeds, and this judgment is affirmed.

{¶74}  However, there are genuine issues of material fact precluding summary judgment in favor of Keyrock and Root on the breach of fiduciary duty and OMBA claims based upon their alleged failure to perform certain functions required of a mortgage broker during the loan application process. There is evidence in the record that Keyrock and Root, instead of performing these functions, entrusted Petrich, the seller in the transaction, with procuring an appraisal of the subject property; obtaining almost all of the financial information from the Goodspeeds, their bank and landlord; and processing the loan documents.

**{¶75}** Accordingly, the judgment of the trial court is affirmed in part, reversed in part and the cause remanded for trial on the Goodspeeds' claims against Keyrock and Root for breach of fiduciary duty and violation of the Ohio Mortgage Broker Act for their alleged failure to perform certain functions required of a mortgage broker during the loan application process.

Waite, P.J., concurs.

Vukovich, J., concurs.